# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* Mendez, *et al.*,<br><br>        Plaintiffs,<br><br>v.<br><br>DOCTORS HOSPITAL AT RENAISSANCE, LTD., *et al.*,<br><br>        Defendants. | Civil Action No. 4:11-cv-2565<br><br>Judge Kenneth M. Hoyt |

## DEFENDANTS DOCTORS HOSPITAL AT RENAISSANCE, LTD.'S AND RGV MED, LLC'S MOTION TO DISMISS AMENDED COMPLAINT

Enu Mainigi (S.D. Tex. Bar # 2357311)
Ashley W. Hardin (S.D. Tex. Bar # 2449547)
WILLIAMS & CONNOLLY LLP
725 Twelfth Street N.W.
Washington, DC 20005
(202) 434-5000

*Attorneys for Defendants Doctors Hospital at Renaissance, Ltd. and RGV Med, LLC*

May 10, 2021

## TABLE OF CONTENTS

NATURE AND STAGE OF PROCEEDINGS ...................................................................2

FACTUAL ALLEGATIONS ..........................................................................................2

ARGUMENT .............................................................................................................6

I.      THE HOSPITAL IS NOT LIABLE FOR DOCTORS' ACTIONS. ...................................7

II.     RELATORS DO NOT PLEAD WITH PARTICULARITY THE ELEMENTS OF
        A FALSE CLAIMS ACT VIOLATION. ....................................................................9

        A.      Relators Do Not Sufficiently Plead the Medical Necessity Theories. ....................9

                1.      Relators do not plead the existence of false claims for payment. ...............9

                2.      Relators do not plead that any claims were false or fraudulent. ...............15

                3.      Relators do not plead that DHR acted "knowingly." ...............................17

                4.      Relators do not plead that any false claim was "material" to the
                        Government's payment decisions. ...........................................................18

        B.      Relators Do Not Sufficiently Plead the Admission Status Theory. .......................19

                1.      Relators do not plead the existence of false claims. ................................19

                2.      Relators do not plead that any claims were false or fraudulent. ...............20

                3.      Relators do not plead that DHR acted knowingly. ..................................21

                4.      Relators do not plead that any false claim was "material." ......................22

        C.      Relators Do Not Sufficiently Plead the Loan and Remuneration Theories. ..........23

                1.      Relators do not plead that DHR offered remuneration in exchange
                        for referrals. ......................................................................................24

                2.      Relators do not plead that DHR acted with criminal intent. .....................25

III.    RELATORS FAIL TO PLEAD A CONSPIRACY TO VIOLATE THE FCA. ...............26

        A.      DHR Cannot Conspire with Itself. .........................................................................26

        B.      Relators Do Not Plead a Conspiracy Between DHR and Anyone Else. .................27

IV.     RELATOR RUSHING HAS FAILED TO STATE A RETALIATION CLAIM. ............28

V.      AMENDMENT IS FUTILE. ........................................................................29

CONCLUSION ..........................................................................................................30

## TABLE OF AUTHORITIES

### CASES

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ....................................................................5, 6

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ...........................................5, 6, 22

*Bouknight v. Hous. Indep. Sch. Dist.*, 2008 WL 110427 (S.D. Tex. Jan. 8, 2008) ........................28

*Cimino v. IBM*, 2019 WL 4750259 (D.D.C. Sept. 30, 2019) ...........................................19

*Delectable Brands v. Yogurtlab USA*, 2017 WL 3676028 (N.D. Ala. Aug. 25, 2017) ................28

*Doctors Hosp. at Renaissance, Ltd. v. Andrade*, 493 S.W.3d 545 (Tex. 2016) ...............3, 7, 8, 17

*Gambrel v. Walker Cnty.*, 2019 WL 1057405 (S.D. Tex. Mar. 6, 2019)......................................26

*Gregory v. Hous. Indep. Sch. Dist.*, 2016 WL 5661701 (S.D. Tex. Sept. 30, 2016)....................10

*Hopper v. Solvay Pharms., Inc.*, 588 F.3d 1318 (11th Cir. 2009) ...................................15

*Thompson v. LifePoint Hosp.*, 2013 WL 5970640 (W.D. La. Nov. 8, 2013) ...............................25

*United States ex rel. Bailey v. Ector Cty. Hosp.*, 386 F. Supp. 2d 759
    (W.D. Tex. 2004) ..................................................................................17, 18

*United States ex rel. Barrett v. Columbia Healthcare Corp.*, 2005 WL 1924187
    (S.D. Tex. Aug. 10, 2005)...............................................................................29

*United States ex rel. Bennett v. Bos. Sci. Corp.*, 2011 WL 1231577
    (S.D. Tex. Mar. 31, 2011)...............................................................................6, 29

*United States ex rel. Bennett v. Medtronic, Inc.*, 747 F. Supp. 2d 745 (S.D. Tex. 2010)..............15

*United States ex rel. Crennen v. Dell Mktg. LP*, 711 F. Supp. 2d 157 (D. Mass. 2010) ..............30

*United States ex rel. Daugherty v. Tiversa Holding Corp.*, 342 F. Supp. 3d 418
    (S.D.N.Y. 2018)..........................................................................................18

*United States ex rel. Davis v. Prince*, 2010 WL 2679761 (E.D. Va. July 2, 2010)......................29

*United States ex rel. Dekort v. Integrated Coast Guard Sys.*, 705 F. Supp. 2d 519
    (N.D. Tex. 2010)..........................................................................................27

*United States ex rel. Doe v. Lincare Holdings*, 2017 WL 752288
    (S.D. Miss. Feb. 27, 2017)...............................................................................10

*United States ex rel. Fields v. Bi-State Dev. Agency*, 2015 WL 5158398
(E.D. Mo. Sept. 2, 2015) ...........................................................................................27

*United States ex rel. Foster v. Bristol-Myers Squibb Co.*, 587 F. Supp. 2d 805
(E.D. Tex. 2008) .......................................................................................................9

*United States ex rel. Gonzalez v. Fresenius Med. Care N. Am.*, 748 F. Supp. 2d 95
(W.D. Tex. 2010) .....................................................................................................29

*United States ex rel. Gray v. Lockheed Martin Corp.*, 2010 WL 672017
(E.D. La. Feb. 19, 2010) ..........................................................................................29

*United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180 (5th Cir. 2009).................6, 10, 17, 24

*United States ex rel. Guth v. Roedel Parsons Koch Blache Balhoff & McCollister*,
626 F. App'x 528 (5th Cir. 2015) ............................................................................10

*United States ex rel. Harman v. Trinity Indus.*, 872 F.3d 645 (5th Cir. 2017) .................15, 21, 22

*United States ex rel. Hess v. Sanofi-Synthelabo Inc.*, 2006 WL 1064127
(E.D. Mo. Apr. 21, 2006)...................................................................................14, 15

*United States ex rel. Jamison v. Del-Jen, Inc.*, 747 F. App'x 216 (5th Cir. 2018).....................5, 8

*United States ex rel. King v. Solvay Pharms.*, 871 F.3d 318 (5th Cir. 2017) ...................24, 25, 28

*United States ex rel. King v. Solvay S.A.*, 823 F. Supp. 2d 472 (S.D. Tex. 2011) ........................26

*United States ex rel. Ligai v. ETS-Lindgren Inc.*, 2014 WL 4649885
(S.D. Tex. Sept. 16, 2014) ...................................................................................26, 27

*United States ex rel. Nowak v. Medtronic, Inc.*, 806 F. Supp. 2d 310 (D. Mass. 2011)...............15

*United States ex rel. Nunnally v. W. Calcasieu Cameron Hosp.*, 519 F. App'x 890
(5th Cir. 2013)....................................................................................................11, 24

*United States ex rel. Park v. Legacy Heart Care, LLC*, 2018 WL 5313884
(N.D. Tex. Oct. 26, 2018) ..........................................................................................1

*United States ex rel. Patel v. Catholic Health Initiatives*, 792 F. App'x 296
(5th Cir. 2019) (per curiam)................................................................................18, 23, 26

*United States ex rel. Patton v. Shaw Servs. LLC*, 418 F. App'x 366 (5th Cir. 2011)...................28

*United States ex rel. Payton v. Pediatric Servs.*, 2017 WL 3910434
(S.D. Ga. Sept. 6, 2017).............................................................................................22

*United States ex rel. Phillips v. Permian Residential Care Ctr.*, 386 F. Supp. 2d 879
(W.D. Tex. 2005)......................................................................................................16

*United States ex rel. Porter v. Magnolia Health Plan*, 810 F. App'x 237
(5th Cir. 2020) ................................................................................................. 19, 29

*United States ex rel. Rafizadeh v. Cont'l Common, Inc.*, 553 F.3d 869 (5th Cir. 2008) .......... 9, 20

*United States ex rel. Riley v. St. Luke's Episcopal Hosp.*, 355 F.3d 370 (5th Cir. 2004) ............. 15

*United States ex rel. Ruscher v. Omnicare, Inc.*, 2015 WL 5178074
(S.D. Tex. Sept. 3, 2015) ........................................................................................... 17

*United States ex rel. Ruscher v. Omnicare, Inc.*, 663 F. App'x 368 (5th Cir. 2016) ............... 9, 23

*United States ex rel. Smith v. Wallace*, 723 F. App'x 254 (5th Cir. 2018) ................................... 21

*United States ex rel. Steury v. Cardinal Health, Inc.*, 735 F.3d 202
(5th Cir. 2013) ............................................................................................... 5, 10, 11, 20

*United States ex rel. Taylor-Vick v. Smith*, 513 F.3d 228 (5th Cir. 2008) ................................... 17

*United States ex rel. Vavra v. Kellogg Brown & Root, Inc.*, 848 F.3d 366
(5th Cir. 2017) ............................................................................................................. 17

*United States ex rel. Wall v. Vista Hospice Care*, 2016 WL 3449833
(N.D. Tex. June 20, 2016) ..................................................................................... 15, 16

*United States v. AseraCare, Inc.*, 938 F.3d 1278 (11th Cir. 2019) ............................................. 16

*United States v. Catholic Health Initiatives*, 312 F. Supp. 3d 584 (S.D. Tex. 2018) .................. 25

*United States v. Choudhry*, 262 F. Supp. 3d 1299 (M.D. Fla. 2017) .......................................... 24

*United States v. Comstor Corp.*, 308 F. Supp. 3d 56 (D.D.C. 2018) .......................................... 19

*United States v. Cross Garden Care Ctr.*, 2021 WL 779176 (M.D. Fla. Mar. 1, 2021) .............. 16

*United States v. Ctr. for Diagnostic Imaging, Inc.*, 787 F. Supp. 2d 1213
(W.D. Wash. 2011) ..................................................................................................... 25

*United States v. Davis*, 132 F.3d 1092 (5th Cir. 1998) ............................................................... 25

*United States v. Health Mgm't Assocs.*, 2013 WL 12077815 (S.D. Fla. Mar. 1, 2013) .......... 11, 13

*United States v. HPC Healthcare, Inc.*, 723 F. App'x 783 (11th Cir. 2018) ......................... 24, 25

*United States v. Lakeway Reg'l Med. Ctr.*, 2020 WL 6146571
(W.D. Tex. Feb. 13, 2020) ......................................................................................... 26

*United States v. Prabhu*, 442 F. Supp. 2d 1008 (D. Nev. 2006) ............................................... 20

*United States v. Ridglea State Bank*, 357 F.2d 495 (5th Cir. 1966)..............................................8

*United States v. Sci. Applications Int'l Corp.*, 626 F.3d 1257 (D.C. Cir. 2010)...........................17

*Univ. Health Servs., Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989 (2016).............. passim

## STATUTES, REGULATIONS, AND COURT RULES

28 U.S.C. § 1395nn(a)(1)....................................................................................................23

31 U.S.C. § 3729(a)(1), (a)(2) (2009)................................................................................17

31 U.S.C. § 3729(a)(1)(A), (a)(1)(B)...............................................................................17

42 C.F.R. § 482.12(c)(2)......................................................................................................7

42 U.S.C. § 1320a-7b.........................................................................................5, 23, 25, 26

42 U.S.C. § 1395nn.......................................................................................................5, 24

Fed. R. Civ. P. 8(a) ......................................................................................1, 5, 6, 22

Fed. R. Civ. P. 9(b) .................................................................................................. passim

Fed. R. Civ. P. 12(b)(6)..........................................................................................6

Texas Medicaid Fraud Prevention Act, Tex. Hum. Res. Code §§ 36.001–36.117........................9

## INTRODUCTION AND SUMMARY OF ARGUMENT

Relators Donna Mendez and Selina Rushing filed a 100-page Amended Complaint containing a grab bag of allegations against the hospital where they worked for a few years a decade ago. Although Relators sue Doctors Hospital at Renaissance, Ltd., a physician-owned hospital ("DHR" or "the Hospital"),[1] their sweeping allegations of fraud focus primarily on alleged actions of doctors. Relators allege that largely unidentified doctors performed medically unnecessary procedures on and unnecessarily admitted unidentified patients. But Relators cannot hold DHR liable for the acts of those doctors, even doctors who are investors in the Hospital, because the Texas Supreme Court held that when DHR's limited partners practice medicine at the Hospital, they are acting under their separate admitting privileges, not with any authority of the Hospital. Nor have Relators pled that any doctors were employees of DHR, such that it could be vicariously liable under the False Claims Act ("FCA") for the doctors' actions.

Even if Relators could plead a basis for holding DHR liable for the doctors' actions, they fail to plead their FCA theories with anything approaching the particularity demanded by Rule 9(b)—and, indeed, fall short even of the more lenient standards of Rule 8(a). Relators' allegations lack any detail about the who, what, when, where, or how of the alleged fraud. They do not identify with particularity which doctors performed the allegedly unnecessary procedures or ordered the unnecessary admissions, for which patients, at what times, or why or how a procedure or admission was unnecessary for any particular patient. Nor do Relators allege that

---

[1] Relators have failed to state a claim against RGV Med, LLC ("RGV"). They plead nothing about RGV except that it is the "general partner for [DHR]" who "conducts extensive business in the State of Texas." Am. Compl. ("AC") ¶ 30. RGV should be dismissed accordingly. *See United States ex rel. Park v. Legacy Heart Care, LLC*, 2018 WL 5313884, at *5 (N.D. Tex. Oct. 26, 2018) (dismissing FCA defendant where "Relator does not offer one factual allegation specifically linking [the defendant] to the alleged fraudulent scheme"). Even if RGV is not dismissed on that independent basis, Relators fail to state a claim against RGV for the same reasons that they fail to do so as to DHR. For efficiency, this Motion focuses on Relators' failure to state a claim against DHR, but the arguments are incorporated as to RGV as well.

any particular patient was a Medicare- or Medicaid-insured patient or that any specific claim for government payment actually was made, or when, how, or who made the claim. And nowhere do Relators connect a specific treatment decision and a resulting allegedly false claim to anyone whose knowledge is imputable to DHR.

Relators' allegations about improper loans and remuneration suffer from the same lack of detail. Relators do not say who from the Hospital offered any remuneration or was involved in loans given from a local bank, to which doctors, in what amounts, or in turn for which referrals. Relators similarly plead no facts to support the "intent" and "materiality" elements of any of their theories. Thus, for each of their theories, Relators fail to plead the elements of any "false claim." Finally, Relators' tag-along claims for alleged conspiracy, retaliation, and violation of the Texas FCA all fail for the same reasons, as well as additional, claim-specific defects.

For these reasons, the Court should dismiss Relators' claims.

## NATURE AND STAGE OF PROCEEDINGS

Relators filed their original complaint on July 13, 2011. Dkt. 1. That complaint remained under seal for more than nine years while the Department of Justice ("DOJ"), the U.S. Attorney's Office for the Southern District of Texas, and the State of Texas (collectively, the "Government") investigated Relators' claims. In October 2018, the Government declined to intervene at that time, Dkt. 67, but the case remained under seal. In December 2020, the Government again declined to intervene. The case was unsealed thereafter. Dkt. 77.

On March 8, 2021, Relators filed their Amended Complaint, which despite the passage of nearly ten years, does not add any particularity to their theories of liability. Dkt. 82.

## FACTUAL ALLEGATIONS

DHR is a physician-owned hospital in Edinburg, Texas, AC ¶ 29, serving millions of patients throughout the Rio Grande Valley. DHR is a limited partnership, *id.*, which, as the

Texas Supreme Court has held as a matter of law, means that "the ordinary course of [DHR's] business does not include the provision of medical care." *Doctors Hosp. at Renaissance, Ltd. v. Andrade*, 493 S.W.3d 545, 548 (Tex. 2016).  DHR's limited partners include doctors who have admitting privileges at the Hospital, but "when limited partners who are also doctors practice medicine at the Hospital, they are acting under their separate admitting privileges, not with any authority of the partnership." *Id.* at 551.

Relators are licensed registered nurses.  AC ¶¶ 8, 11.  Relator Mendez was employed by DHR beginning on April 13, 2009.  *Id.* ¶ 8.  Mendez voluntarily left DHR's employ in September 2011.  For four months (April to August 2009), she worked as a case manager in the DHR Catheterization Lab ("Cath Lab").  Mendez alleges that "her primary responsibilities were to ensure that patients in the Cath Lab received medically appropriate and cost-effective care" by reviewing "all Cath Lab patients' charts."  *Id.*  From August 2009 until at least July 2011, Mendez was assigned as a case manager on the pediatric floor, where she reviewed medical necessity and discharge planning.  *Id.* ¶ 9.

Relator Rushing worked at DHR from May 14, 2007 until she was fired for insubordination on May 25, 2011.  *Id.* ¶¶ 11, 13.  Rushing began her employment with DHR as a clinical nurse in the labor and delivery ward.  *Id.* ¶ 11.  In February 2009, Rushing stopped treating patients, and for four months she worked as a case manager in the Cath Lab.  *Id.* ¶ 12.  She then returned to labor and delivery as a case manager from June 2009 until April 2011.  Neither Relator is a licensed medical doctor, and except for Rushing's stint in labor and delivery from 2007–2009, neither Relator provided medical care to any patient at DHR.  *Id.* ¶¶ 11–12.

Though they are not doctors and have little experience treating patients at DHR, most of Relators' theories of liability are based on disagreements with doctors' treatment decisions.

Relators allege that doctors throughout the Hospital, including in departments in which they never worked, performed and billed for medically unnecessary procedures or pharmaceuticals, or unnecessarily admitted patients to the Hospital ("Medical Necessity Theories").  AC ¶¶ 156–96, 227–31.  The Medical Necessity Theories include, for example, criticism of doctors for (i) giving "a battery of tests" to patients who showed symptoms of possible "heart failure" because the doctors did not also instruct the patients to "change" their "diet," *id.* ¶ 163; (ii) not "fully explor[ing]" "less invasive medical procedures … before electing to place a pacemaker," *id.* ¶ 167; and (iii) giving too many tests to children sick with a serious respiratory virus, *id.* ¶ 172.  Relators do not allege any objective basis for their disagreement with doctors' treatment decisions for any Medical Necessity Theory; they rely instead on their own allegedly self-taught understanding of medical-necessity guidelines and complicated Medicare and Medicaid laws.  *Id.* ¶¶ 16, 240–241.

Relators go on to admit that they contacted various agencies regarding supposed regulatory violations at the Hospital, including the Joint Commission on Accreditation on Hospitals ("JCAHO"), "the agency that regularly audits hospitals on their compliance with Medicare regulations," the Texas Branch of the National Hospital Inpatient Quality Reporting Program, and the Texas Department of Health and Human Services ("Texas HHS").  *Id.* ¶¶ 20, 21, 23.  Relators allege that JCAHO "contacted the hospital's Risk Management Department" and that Texas HHS offered to speak with the medical advisor to the Hospital's Utilization Review Committee staff, *id.* ¶¶ 22–23, but they do not allege that any federal or state organization took any adverse action against DHR as a result of their complaints.

In addition to the Medical Necessity Theories, Relators allege two other theories of fraud against DHR.  Through their "Admission Status Theory," they allege that members of DHR's

Utilization Review Committee improperly changed patients' admission status without obtaining allegedly necessary orders from doctors. *Id.* ¶¶ 197–212. Finally, through their "Loan and Remuneration Theory," Relators assert that DHR violated the Stark Law, 42 U.S.C. § 1395nn, and Anti-Kickback Statute ("AKS"), 42 U.S.C. § 1320a-7b, by "indirectly" providing loans through Lone Star National Bank ("LSNB"), an independent bank unaffiliated with DHR, and offering "kickbacks" to physician investors. AC ¶¶ 213–26.

Finally, Relators have two additional claims. Relators assert that DHR engaged in a conspiracy with itself and other defendants to submit false claims, *id.* ¶¶ 232–34, 275–81, and Relator Rushing brings a claim that DHR retaliated against her for raising questions relating to patients' admission status, *id.* ¶¶ 235–50, 282–85.

## STATEMENT OF ISSUES AND STANDARD OF REVIEW

1.      Whether Relators failed to sufficiently plead any legal or factual basis for holding DHR vicariously liable for the alleged actions of doctors whom DHR is not alleged to employ. *See United States ex rel. Jamison v. Del-Jen, Inc.*, 747 F. App'x 216, 219–20 (5th Cir. 2018) (per curiam) ("When a defendant is alleged to be vicariously liable for the actions of another, the plaintiff must develop an attributed liability theory to make out a FCA claim.").

2.      Whether Relators failed to sufficiently plead their FCA theories under Federal Rule of Civil Procedure 8(a) and with the particularity demanded by Federal Rule of Civil Procedure 9(b). *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) (plaintiff must plead enough facts to state a claim to relief that is plausible on its face); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (standard demands more than "a formulaic recitation of the elements of a cause of action" or "naked assertions devoid of further factual enhancement"); *United States ex rel. Steury v. Cardinal Health, Inc.*, 735 F.3d 202, 205 (5th Cir. 2013) (to survive a motion to

dismiss, "it is necessary to plead with particularity the who, what, when, where and how of the falsity"); *Univ. Health Servs., Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989, 2004 n.6 (2016) (Rule 9(b) applies to pleading elements of FCA claim).

3.    Whether Relators failed to sufficiently plead their False Claims Act conspiracy claim under Rule 8(a) and with the particularity demanded by Rule 9(b).  *See United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 193 (5th Cir. 2009) ("The particularity requirements of Rule 9(b) apply to the False Claims Act's conspiracy provision.").

4.    Whether Relator Rushing failed to plead her retaliation claim with the plausibility demanded by Rule 8(a).  *See Twombly*, 550 U.S. at 570; *Iqbal*, 556 U.S. at 678; *United States ex rel. Bennett v. Bos. Sci. Corp.*, 2011 WL 1231577, at *34 (S.D. Tex. Mar. 31, 2011) ("threadbare recitations of the elements of an FCA retaliation claim do not meet Rule 12(b)(6)'s pleading standard").

## ARGUMENT

Relators throw multiple theories of wrongdoing against the wall, but they fail to plead any viable theory for holding DHR liable for their allegations, much less any particular facts that could make any of their theories stick.  *First*, Relators do not articulate any legal or factual basis for holding DHR liable for the Medical Necessity Theories, all of which focus on the medical decisions of doctors and for which DHR is not liable as a matter of law.  *Second*, Relators do not plead facts to support any of the elements of a False Claims Act violation under *any* of their theories of liability.  Relators do not plead the "who, what, when, where, and how" of the alleged fraud for any theory.  *Third*, Relators similarly fail to plead the existence of a conspiracy to submit false claims.  *Finally*, Relator Rushing does not plead facts to support her retaliation claim.  Relators have had ***ten years*** to refine their claims, yet their recently amended complaint is

as defective as their initial complaint.  For that reason, it would be futile to permit Relators to amend once more, and the Court should dismiss this case with prejudice.

## I.     THE HOSPITAL IS NOT LIABLE FOR DOCTORS' ACTIONS.

As to the Medical Necessity Theories, Relators' allegations focus almost exclusively on the conduct of individual doctors.  *See* AC ¶¶ 156–96, 227–31.  The Amended Complaint is replete with allegations that doctors who had privileges at DHR performed unnecessary medical procedures on patients and unnecessarily admitted patients to the Hospital from May 2007 to July 2011.[2]  But even if Relators could state a claim against one or more doctors—which they have not, *see infra* Part II.A—they have failed to state a claim *against DHR* for three reasons:

*First*, patient care is the responsibility of the treating physician, not that of the limited partnership that is DHR.  As the Medicare Benefit Policy Manual, which Relators cite, makes clear, "[*t*]*he physician or other practitioner responsible for a patient's care* at the hospital is also responsible for deciding whether the patient should be admitted as an inpatient."  Medicare Benefit Policy Manual § 1.10; AC ¶ 83;[3] *see* 42 C.F.R. § 482.12(c)(2) ("Patients are admitted to the hospital only on the recommendation of a licensed practitioner permitted by the State to admit patients to a hospital.").  Relators concede this point.  AC ¶ 82 ("The attending physician determines the patient's admission status.").  And as the Supreme Court of Texas has held—in a case about DHR— "the ordinary course of [DHR's] business does not include a doctor's medical treatment of a patient."  *Doctors Hosp.*, 493 S.W.3d at 546.  "[T]he ordinary course of [DHR's]

---

[2] *See, e.g.*, AC ¶¶ 163 ("doctors did not prescribe any treatment management" before ordering echocardiograms); 164 ("doctors in the cath lab are qualifying and providing patients with unnecessary internal cardiac defibrillators"); 167 ("the doctors in the Cath Lab routinely provided pacemakers to patients who did not actually need the device"); 173 ("Individual doctors routinely admitted children unnecessarily or hospitalized them for longer than medically necessary …."); 176 ("The OB/GYNs … commonly induce labor … to have free time" and for "time to travel"); 186 ("The admitting physician, often an investor, … frequently assigned a DRG reflective of the highest utilization available …."); 229 ("doctors would prescribe the use of Cardene I.V. to treat" symptoms unnecessarily).

[3] Unless otherwise noted, all emphases herein are added and all internal citations and quotations omitted.

business does not include the provision of medical care," and DHR does not (and legally, cannot) "exert control over a doctor's practice of medicine." *Id.* at 548. Thus, even assuming that *some* of the doctors named in the Amended Complaint were investors in the hospital, even when "limited partners who are also doctors practice medicine at the Hospital, they are acting under their separate admitting privileges, not with any authority of the partnership," and "[a]s such, [DHR] cannot be liable for [a doctor's] alleged negligence in providing medical care at the Hospital." *Id.* at 551.

*Second*, Relators have not alleged that a single doctor who allegedly ordered medically unnecessary procedures or unnecessarily admitted patients was a DHR employee, and therefore, that any doctor acted within the scope of any employment or agency with DHR. *See United States v. Ridglea State Bank*, 357 F.2d 495, 500 (5th Cir. 1966) (corporation may be liable for FCA violations if its *employees* acted within the scope of their authority and for the corporation's benefit); *Jamison*, 747 F. App'x at 220 (Without "a relationship between the parties giving rise to the right of control, one person is under no legal duty to control the conduct of another.").

*Third*, Relators do not even attempt to allege that DHR is vicariously liable for the acts of the physicians who practiced medicine at DHR. "When a defendant is alleged to be vicariously liable for the actions of another, the plaintiff must develop 'an attributed liability theory' to make out a FCA claim." *Jamison*, 747 F. App'x at 219–20 (quoting *Grubbs*, 565 F.3d at 192). Relators do not develop any such theory. They make only an unexplained, conclusory allegation that "acts alleged … to have been committed by the Doctors Hospital Defendants and its related limited partnerships were committed by officers, directors, employees, representatives, or agents, who at all times acted on behalf of the Doctors Hospital Defendants and … within the course and scope of their employment." AC ¶ 49. Four physician investors are named as part of the

"Doctors Hospital Defendants," *id.* ¶¶ 33–36, but Relators do not even allege that any of them performed unnecessary procedures or unnecessarily admitted any patients, much less that DHR could be liable for such conduct.

## II. RELATORS DO NOT PLEAD WITH PARTICULARITY THE ELEMENTS OF A FALSE CLAIMS ACT VIOLATION.

Relators must plead with particularity four elements to state a FCA claim: "(1) ... there was a false statement or fraudulent course of conduct; (2) made or carried out with the requisite scienter; (3) that was material; and (4) that caused the government to pay out money or to forfeit moneys due (i.e., that involved a claim)." *United States ex rel. Ruscher v. Omnicare, Inc.*, 663 F. App'x 368, 373 (5th Cir. 2016) (per curiam); *see Escobar*, 136 S. Ct. at 2004 n.6 (FCA claims must be pled with particularity). Because Relators failed to plead multiple elements of each of their theories with the required particularity, their claims should be dismissed.[4]

### A. Relators Do Not Sufficiently Plead the Medical Necessity Theories.

Even if Relators could hold DHR liable for their Medical Necessity Theories (they cannot, *see supra* Part I), those theories should be dismissed because Relators do not adequately plead (1) the existence of any false claim for payment; (2) that any medical decision-making was "false"; (3) that DHR "knowingly" submitted false claims, or (4) that the alleged falsehoods were "material" to the Government's payment decisions.

#### 1. Relators do not plead the existence of false claims for payment.

In the Fifth Circuit, "the linchpin of an FCA claim is a false claim," so Relators must "state the factual basis for the fraudulent claim with particularity." *United States ex rel. Rafizadeh v. Cont'l Common, Inc.*, 553 F.3d 869, 873 (5th Cir. 2008). Even if Relators cannot

---

[4] Relators' assert the same allegations and theories under the Texas Medicaid Fraud Prevention Act, Tex. Hum. Res. Code §§ 36.001–36.117. *See* AC ¶¶ 321–31. Because that Texas law is "substantively the same as the federal FCA," Relators' claim fails for the same reasons discussed herein. *United States ex rel. Foster v. Bristol-Myers Squibb Co.*, 587 F. Supp. 2d 805, 808 (E.D. Tex. 2008).

"allege the details of an actually submitted false claim," they must set forth "particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted." *Grubbs*, 565 F.3d at 190.  To satisfy that standard, Relators must "plead with particularity the who, what, when, where, and how of the falsity" they allege. *Steury*, 735 F.3d at 205; *see Gregory v. Hous. Indep. Sch. Dist.*, 2016 WL 5661701, at *7 (S.D. Tex. Sept. 30, 2016) (dismissing claims that failed to allege "what medical service was provided, when it was provided, when and who billed the procedure, and why that service was medically unnecessary"); *United States ex rel. Doe v. Lincare Holdings*, 2017 WL 752288, at *6 (S.D. Miss. Feb. 27, 2017) (dismissing claims for failure to allege "any identifying information about the amount of specific claims or the dates on which they were submitted," any "knowledge of how bills were submitted," or to identify "any billing personnel who submitted false claims").

Relators do not come close to satisfying this legal standard.  They make no particular allegation of the "who" (either the patients who allegedly received the treatment or, with three limited exceptions, the doctors who allegedly provided it); the "what" (the particular circumstances that make the treatment for a patient allegedly unnecessary or otherwise improper); the "when" (the dates on which the treatment allegedly was provided); or the "how" (allegations that the Government was actually billed for the treatment as opposed to a private payor).  Instead, they rely on precisely the kind of "speculation or conclusional allegations" that cannot pass muster under Rule 9(b).  *United States ex rel. Guth v. Roedel Parsons Koch Blache Balhoff & McCollister*, 626 F. App'x 528, 531 (5th Cir. 2015).

a.  <u>Hospital-Wide Admissions</u>:  Relators claim broadly that doctors "admit to the hospital unnecessarily patients of every age, into every medical department and every partner hospital," and that Relators "have observed a high rate of unnecessary admissions."  AC ¶ 159; *see also id.*

¶¶ 156–58.  They do not allege, however, that any improper admissions were of federally- or state-insured patients, let alone identify the "who, what, when, where, and how" of the alleged fraudulent admissions.  *Steury*, 735 F.3d at 205.  Relators also allege that DHR "drive[s] referrals," AC ¶ 158, but without specificity; they do not allege that anyone with knowledge imputable to DHR was aware of any improper admissions and fraudulently billed Medicare or Medicaid for those admissions.  Such reliance on a single "broad and sweeping" allegation regarding unidentified practices across the Hospital does not satisfy their burden.  *United States ex rel. Nunnally v. W. Calcasieu Cameron Hosp.*, 519 F. App'x 890, 893 (5th Cir. 2013).

      b.  <u>Cardiac Procedures and Admissions</u>:  Relators allege that doctors performed unnecessary echocardiograms, provided unnecessary internal cardiac defibrillators and pacemakers, and unnecessarily admitted post-surgical patients to the hospital.  AC ¶¶ 160–70.  Relators do not identify a single example of such "unnecessary" procedures, describe the circumstances of such a procedure, identify a single doctor who allegedly directed medically unnecessary care, or describe a claim submitted to the Government.  Even the allegations as to why the procedures were unnecessary are conclusory, and thus, insufficient.  *See United States v. Health Mgm't Assocs.*, 2013 WL 12077815, at *3 (S.D. Fla. Mar. 1, 2013).

      As to DHR specifically, nowhere do Relators allege that anyone with knowledge imputable to the Hospital knew that any procedures or admissions were improper.  They claim that DHR would bill for a more expensive pacemaker model than actually was used, but they do not allege who at the Hospital authorized the billing or if (s)he did so with knowledge or in reckless disregard that the bill was incorrect.  AC ¶ 167.  To the contrary, while they allege that certain case managers and staff believed that "files in the Cath Lab lacked medical necessity,"

Relators expressly plead that the treating physicians believed those procedures/admissions *were* necessary.  *Id.* ¶ 161.

c.  <u>Pediatric Ward Admissions</u>:  Relators allege—again, without the necessary particularity—that unidentified doctors in the Pediatric Ward unnecessarily admitted and treated unidentified children at unidentified times.  They fail to allege why the admissions/treatments were improper for any particular child, if the children were federally or state insured, that any false claims were submitted to the Government as a result, or that anyone with knowledge imputable to DHR knew the procedures or admissions were improper, or acted in reckless disregard, and nevertheless authorized billing those procedures/admissions to the Government. *Id.* ¶¶ 171–74.

d.  <u>Admissions at Women's Hospital</u>:  Relators offer conclusory allegations regarding doctors' admissions of pregnant women (1) for inductions of labor, (2) experiencing "regular contractions" for premature labor, and (3) experiencing "elevated blood pressure" for hypertension-related complications.  *Id.* ¶¶ 175–80.  They do not allege any of the necessary facts: what patients should not have been admitted, which doctors admitted them, and why the doctors were wrong to admit them.  And while Relators end with a passive and conclusory assertion that false claims were "submi[tted]," *id.* ¶ 180, they offer no supporting factual allegations.  As to DHR specifically, they do not allege that anyone with knowledge imputable to DHR knew or acted in reckless disregard of an improper admission and nonetheless billed the Government for that admission.

e.  <u>Use of Helicopter Transportation</u>:  Relators allege that doctors told DHR case managers on four (unidentified) occasions to "obtain pre-authorization for flight transportation to Driscoll's Children's Hospital in Corpus Christi" even though the children could have been

transported by ambulance.  *Id.* ¶ 181.  Relators do not describe the specific incidents, patients, or ordering doctors at all, much less with particularity.  Relators also allege that "[i]t was understood at [DHR] that the doctors ordered these flights because the patient's parents were undocumented aliens," *id.*, but they do not identify any particular person who understood that, and while Relators allege these were "Medicaid patients," *id.*, they do not allege that Medicaid (or any other government program) was billed for the flights.

f.  <u>Admissions in the Behavioral Medicine Hospital</u>:  Relators allege that two doctors—neither defendants here nor alleged investors or employees of DHR—admit patients for mental-health purposes using improper admission criteria.  *Id.* ¶¶ 182–85.  While Relators describe one example of a 75-year-old patient, they do not allege that he was a Medicare or Medicaid beneficiary.  *Id.* ¶ 184.  They do not detail any other specific incidents or patients who were wrongly admitted, offer only conclusory allegations that the admissions were done "to bill Medicaid or Medicare," *id.* ¶ 182, and do not allege that either program paid for the allegedly unnecessary admissions.  And again, they do not allege that anyone with knowledge imputable to DHR acted with the requisite scienter in billing the Government for unnecessary claims.

g.  <u>Coding</u>:  Relators make broad assertions that "admitting physicians" "upcoded" diagnosis-related codes to bill for more expensive procedures.  *Id.* ¶¶ 186–88.  Relators do not describe a single example of such improper coding, describe the circumstances of any patient to support the suggestion that the coding actually was improper, identify the codes used and which ones should have been used instead, or identify a single doctor who allegedly directed the mis-coding.  Relators do not even suggest, except in conclusory terms, that any actual claims were submitted to the state or federal governments with the alleged miscoding.  Nor do Relators allege that anyone at the Hospital was even aware of this alleged "upcoding" by doctors, much less

billed the Government while possessing this awareness.

h. <u>Unsupervised Care</u>:  Relators claim that certain procedures were performed without the level of physician supervision that Relators believe was required, including Cath Lab procedures, eye procedures, infant deliveries, and length-of-admission decisions.  *Id.* ¶¶ 189–96. Relators do not identify or describe any example of such an unsupervised procedure, the circumstances of any particular patient to support the suggestion that there was not enough supervision, the identity (with one exception)[5] of the doctor who allegedly did not perform adequate supervision, or that anyone at the Hospital was aware of this alleged "upcoding" by doctors, much less billed the Government while possessing the required scienter.

i. <u>Off-Label</u>:  Finally, Relators' "off-label marketing" theory regarding the drug Cardene I.V. similarly fails to describe with particularity any allegedly improper use of the drug.  Relators say what the drug is "used for," *id.* ¶ 228, but they do not allege the FDA-approved indications or the specified uses in any drug compendia (if any) for Cardene I.V., which is essential to allege the "what" of an off-label theory.  *See United States ex rel. Hess v. Sanofi-Synthelabo Inc.*, 2006 WL 1064127, at *2 (E.D. Mo. Apr. 21, 2006) (Medicaid reimbursement "is, *in most circumstances*, available only for 'covered outpatient drugs,'" which looks to the medically accepted indication(s) "or which is included in specified drug compendia").

Relators similarly fail to allege any details regarding the "who," "when," and "how" of any inappropriate use of the drug.  Relators do not allege which doctors prescribed Cardene I.V., when or for which patients they did so, why Cardene I.V. was an inappropriate treatment for any

---

[5] Relators identify Dr. Vincent Honrubia and accuse him of performing too many procedures, relying on a physician assistant, and billing for bilateral instead of unilateral procedures, AC ¶ 191, but they do not even attempt to tie DHR to those allegations.  They do not allege that Dr. Honrubia was an employee or agent of DHR, that DHR was aware of Dr. Honrubia's alleged improper practices, or that the Hospital ever billed for any improper procedures performed by Dr. Honrubia while possessing guilty knowledge.

particular patient, or who (if anyone) submitted any false claim for reimbursement.  AC ¶ 228

(acknowledging that Cardene I.V. is appropriate for some patients).  As to DHR specifically,

Relators fail to show anyone at DHR who submitted a claim with guilty knowledge.  Nor do they

identify anyone at DHR (which, again, is a partnership and does not practice medicine) who

knew that Cardene I.V. was allegedly being mis-prescribed.  In fact, Relators allege *to the*

*contrary*—that the drug manufacturer, Defendant EKR Therapeutics, LLC, marketed the drug to

DHR to be "used with all patients … suffering from high blood pressure," *id.* ¶ 231—which

undercuts any allegation that DHR knew the drug was to be used only in limited circumstances

and was being misused.  *See Hopper v. Solvay Pharms., Inc.*, 588 F.3d 1318, 1326 (11th Cir.

2009) (per curiam) (affirming dismissal of off-label marketing FCA claims).[6]

### 2.       Relators do not plead that any claims were false or fraudulent.

Even if Relators had sufficiently identified claims submitted by DHR to the Government

for medically unnecessary procedures or admissions (they have not), their Medical Necessity

Theories fail because they have not alleged any "falsehood."  The FCA "requires a statement

known to be false, which means *a lie* is actionable but not an error."  *United States ex rel. Riley*

*v. St. Luke's Episcopal Hosp.*, 355 F.3d 370, 376 (5th Cir. 2004).  "Disagreement over the

quality of [professional] judgment is not the stuff of fraud."  *United States ex rel. Harman v.*

*Trinity Indus.*, 872 F.3d 645, 656 (5th Cir. 2017).  Accordingly, "an FCA claim about the

exercise of [a physician's] judgment must be predicated on the presence of an objectively

verifiable fact at odds with the exercise of that judgment, not a matter of questioning subjective

clinical analysis."  *United States ex rel. Wall v. Vista Hospice Care*, 2016 WL 3449833, at *17

---

[6] *See also United States ex rel. Bennett v. Medtronic, Inc.*, 747 F. Supp. 2d 745 (S.D. Tex. 2010) (dismissing off-label marketing FCA claims); *Hess*, 2006 WL 1064127, at *6 (same); *United States ex rel. Nowak v. Medtronic, Inc.*, 806 F. Supp. 2d 310, 356–57 (D. Mass. 2011) (same).

(N.D. Tex. June 20, 2016); *see United States v. AseraCare, Inc.*, 938 F.3d 1278, 1281 (11th Cir. 2019) (physician's "clinical judgment . . . cannot be deemed false" when "there is only a reasonable disagreement between medical experts as to the accuracy of that conclusion, with no other evidence to prove the falsity of the assessment"); *United States ex rel. Phillips v. Permian Residential Care Ctr.*, 386 F. Supp. 2d 879, 884 (W.D. Tex. 2005) (FCA "should not be used to call into question a health care provider's judgment regarding a specific course of treatment").

Here, Relators—who are not physicians and cannot legally practice medicine—have not pled specific "facts and circumstances" of a particular clinical judgment "that are inconsistent with the proper exercise of a physician's clinical judgment." *AseraCare*, 938 F.3d at 1297. Instead, they have merely pled that they disagreed with the medical judgment of unnamed physicians for unspecified patients under unexplained circumstances, *see* AC ¶¶ 156–96, 227–31, even though they are not qualified to register professional disagreement on such decisions, and they concede that the treatment decisions entail "complex medical judgment," *id.* ¶ 83. *See United States v. Cross Garden Care Ctr.*, 2021 WL 779176, at *5 (M.D. Fla. Mar. 1, 2021) (nurse's "medical opinion . . . constitute[s], at best, an unsupported difference of opinion" and "does not satisfy the requirement of falsity"). And even if Relators were qualified to second guess doctors' treatment decisions, "[a] properly formed and sincerely held clinical judgment is not untrue even if a different physician later contends that the judgment is wrong." *AseraCare*, 938 F.3d at 1297; *see also Vista Hospice*, 2016 WL 3449833, at *17. In any event, Relators plead no facts to show the doctors themselves believed the procedures or admissions to be unnecessary or why any action would be inconsistent with the proper exercise of clinical judgment. Because they have not alleged any facts regarding even the treating doctors, *a fortiori*, they have not alleged those facts as to DHR.

### 3.    Relators do not plead that DHR acted "knowingly."

The FCA requires proof that DHR "knowingly" submitted a false claim or statement.  31

U.S.C. § 3729(a)(1)(A), (a)(1)(B); *see also* 31 U.S.C. § 3729(a)(1), (a)(2) (2009).  Because that

intent standard is "rigorous" and must be "strict[ly] enforce[d]," including at the pleading stage,

*Escobar*, 136 S. Ct. at 2002, Relators must plead that DHR had "guilty knowledge of a purpose .

. . to cheat the Government."  *United States ex rel. Taylor-Vick v. Smith*, 513 F.3d 228, 232 (5th

Cir. 2008) (summary judgment appropriate where there was no evidence that "the defendants

knowingly or recklessly cheated the government").  Alleging improper actions by a doctor is

insufficient; Relators must show that someone with knowledge imputable to DHR knew or acted

in reckless disregard that the particular procedures of which they complain were inappropriate

and nevertheless billed the procedure.  *United States ex rel. Vavra v. Kellogg Brown & Root,

Inc.*, 848 F.3d 366, 375 (5th Cir. 2017) (FCA intent inquiry turns on "whether an employee's

knowledge may be fairly imputed to the corporation").[7]  Relators make no such allegations.

They sporadically allege that "Doctors Hospital" ordered unnecessary procedures, *see*

AC ¶¶ 160, 179–80, 185, but there is no specific allegation as to what *DHR* did, and as a matter

of law, DHR does not order procedures.  *See Doctors Hosp.*, 493 S.W.3d at 548 ("[O]nly a

licensed doctor can provide medical care.  Only a person, not a partnership, may be licensed to

practice medicine."); *see United States ex rel. Bailey v. Ector Cty. Hosp.*, 386 F. Supp. 2d 759

(W.D. Tex. 2004).  Because Relators fail to allege that DHR knew doctors were making

objectively inappropriate medical decisions and nonetheless submitted claims for their payment,

Relators have failed to state a claim against DHR.  *See Grubbs*, 565 F.3d at 192 (affirming

---

[7] Nor could Relators rely on "aggregate" knowledge of various individuals across DHR to prove this element. *United States ex rel. Ruscher v. Omnicare, Inc.*, 2015 WL 5178074, at *29 (S.D. Tex. Sept. 3, 2015), *aff'd*, 663 F. App'x (5th Cir. 2016); *see United States v. Sci. Applications Int'l Corp.*, 626 F.3d 1257, 1274 (D.C. Cir. 2010) (rejecting "collective knowledge" theory).

dismissal of FCA claims against hospital; hospital "may have been inadvertently and in the normal course of business processing the claims of services fraudulently exaggerated by its doctors" and the allegations provided "no basis for inferring otherwise."); *Bailey*, 386 F. Supp. 2d at 766 (hospital entitled to judgment as a matter of law; it merely "bills for the use of the facilities" and "[i]t is undisputed that Relator received a cardiac procedure at [the hospital]").

### 4. Relators do not plead that any false claim was "material" to the Government's payment decisions.

Relators also fail to plead facts showing that the alleged falsehoods were material. Materiality "turn[s] on whether the government would pay the claim or not if it knew of the claimant's violation." *United States ex rel. Patel v. Catholic Health Initiatives*, 792 F. App'x 296, 301 (5th Cir. 2019) (per curiam). The "standard is demanding;" Relators must plead materiality "with plausibility and particularity," *Escobar*, 136 S. Ct. at 2003, 2004 n.6, and not merely with "conclusory" recitations of the standard, *United States ex rel. Daugherty v. Tiversa Holding Corp.*, 342 F. Supp. 3d 418, 428–29 (S.D.N.Y. 2018).

Because they do not plead with particularity the circumstances of any allegedly unnecessary treatment or admission, Relators do not—and cannot—plead with particularity that knowledge (or lack thereof) of those particular circumstances was material to the government's payment decision. It is not possible to plead materiality of undescribed and unidentified claims.

All Relators allege is a conclusory parroting of the legal standard, absent any supporting factual allegations, *see* AC ¶¶ 267–68, 271–72, 279, 294–95, 298, 301–02, 306, 324, 326, which does not satisfy the pleading standard. *See Escobar*, 136 S. Ct. at 2004 n.6; *Tiversa Holding Corp.*, 342 F. Supp. 3d at 428–29. This absence of allegations is hardly surprising—the only relevant facts in the record *undermine* Relators' claims and show that the Government does not find Relators' allegations material. *First*, there is no allegation that, at any time during the **10-**

*year period* that the Government spent investigating Relators' claims, the Government declined to pay any claims submitted to Medicare or Medicaid by DHR.  *Second*, there is no allegation that the Government declined to pay any claims after Relators disclosed the alleged conduct to multiple government agencies.  *See supra* at 4–5.  *Finally*, after exhaustively investigating Relators' claims for nearly a decade, the Government declined to intervene in the case.  This decision is particularly relevant where, as here, the relator has not alleged any factual basis for materiality.  *See Cimino v. IBM*, 2019 WL 4750259, at *7 (D.D.C. Sept. 30, 2019) (decision not to intervene is entitled to some respect in materiality analysis, particularly where the relevant government entity declined to intervene "after a multi-year investigation").[8]

## B.    Relators Do Not Sufficiently Plead the Admission Status Theory.

Relators' Admission Status Theory, in which they allege that DHR changed patients' admission statuses from inpatient to outpatient without following the process required by Medicare Condition Code 44 ("Condition Code 44"), AC ¶¶ 197–212, fails for similar reasons: Relators do not plead (1) the existence of any false claims for payment submitted under that theory, (2) that any claims for payment were false or fraudulent; (3) that DHR acted with scienter, or (4) that the alleged falsehoods were material.

### 1.    Relators do not plead the existence of false claims.

Relators allege that DHR "never follows the correct procedures for establishing a patient's admission status," and that Hospital staff would (until the practice ended in 2010) change patients' admission statuses without doctor involvement and patient notification, as required by Condition Code 44.  *Id.* ¶¶ 198–208.  But as with their Medical Necessity

---

[8] *See also United States v. Comstor Corp.*, 308 F. Supp. 3d 56, 86 (D.D.C. 2018) ("The requirement of demonstrating materiality would seem especially crucial here where the government declined to intervene. . . ."); *United States ex rel. Porter v. Magnolia Health Plan*, 810 F. App'x 237, 242 (5th Cir. 2020) (affirming dismissal for lack of materiality; noting Mississippi Division of Medicaid took no action after being informed of the alleged fraud).

allegations, Relators fail to "plead with particularity the who, what, when, where, and how of the falsity." *Steury*, 735 F.3d at 205.  While they name some Hospital staff who allegedly changed patient admission statuses, they do not allege which patients, when the change occurred, why those changes were improper, when claims for those changes were submitted, or by whom.

### 2.   Relators do not plead that any claims were false or fraudulent.

Relators also fail to allege the falsity of any admission claims submitted to the Government after an alleged changed status.  Because "the FCA is not intended to be some wide-ranging statute to police all types of regulatory or contractual compliance," *United States v. Prabhu*, 442 F. Supp. 2d 1008, 1033 (D. Nev. 2006), Relators must allege that a failure to follow patient admissions regulations led to a "false" claim actually submitted to the Government.  *See Rafizadeh*, 553 F.3d at 873 ("the linchpin of an FCA claim is a false claim").  But nowhere do they allege either factual or legal falsity.  As to factual falsity, Relators do not allege that the Hospital billed for any treatment or procedures that were not actually provided during patients' stays, and, in fact, allege that DHR "downgrade[d]" statuses and billed for a ***less expensive*** status than the doctor actually ordered.  AC ¶ 204.[9]  As for legal falsity, Relators' claims are equally deficient.  Nowhere do Relators allege an "express" legal falsehood, or even an implied legal falsity, which may arise when "the claim does not merely request payment, but also makes specific representations about the goods or services provided" and the representations become "misleading half-truths" because of a "failure to disclose noncompliance with material statutory,

---

[9] Relators demonstrate their confusion by alleging that the Hospital submitted claims for payment for inpatient stays and then, after billing, downgraded the patient's status but "did not remit the overpayments."  AC ¶¶ 200, 206.  Those allegations are not plausible because there is no purpose to downgrading the admission status *after* the claim has been billed to the government at the higher inpatient status.  *See* Centers for Medicare and Medicaid Services, Use of Condition Code 44 "Inpatient Admission Changed to Outpatient, https://www.cms.gov/regulations-and-guidance/guidance/transmittals/downloads/r299cp.pdf ("Condition Code 44—Inpatient admission changed to outpatient – For use on outpatient claims only, when the physician ordered inpatient services, but upon internal review performed before the claim was initially submitted, the hospital determined the services did not meet its inpatient criteria.").

regulatory, or contractual requirements." *Escobar*, 136 S. Ct. at 2001.  Relators plead nothing

about what DHR allegedly certified in any claim, much less that it made a certification that

would make failing to disclose a Condition Code 44 violation a misleading half-truth.  *See*

*United States ex rel. Smith v. Wallace*, 723 F. App'x 254, 256 (5th Cir. 2018) (per curiam)

(implied-false-certification theory fails where a Relator (1) "never identifies any claim"

submitted; and (2) provides no "evidence that would support a finding that the claims included

'specific representations' that were 'misleading half-truths'").

### 3.    Relators do not plead that DHR acted knowingly.

Relators have not pled that DHR acted with the requisite scienter in changing patient

admission statuses and billing the government for those changed statuses.  *See Harman*, 872 F.3d

at 657 ("relator must demonstrate that the defendant acted with knowledge of the falsity of the

statement, which … at a minimum [is] acting in reckless disregard of the truth or falsity of the

information").  Relators do not plead that any case manager or Utilization Review staff member

knew what the regulations required but deliberately chose not to follow them or acted in reckless

disregard of them.  Instead, Relators concede that when they complained to their supervisors

about the issue, the Physician Advisor and Director of Case Management immediately changed

the practice.  AC ¶ 210.  Relators allege that the new Physician Advisor, Dr. Hernandez, was

"less receptive" to their "objections," but they allege that he ordered them to "approach

physicians and obtain status changes," which is what they say was required.  *Id.* ¶ 25.  Relators

also allege that Dr. Hernandez held several meetings with the staff to address "what was wrong

with the billing practices and what they could do to fix it," that he instituted a new policy on

admissions that was disseminated to case managers, that the Hospital hired an outside consultant

to review the Hospital's "procedures and files," and the Hospital also "attempted to quietly

educate and train the staff without outside consultants."  *Id.* ¶¶ 243, 245, 247, 249–50.  These

allegations do not demonstrate a hospital acting with reckless disregard of the regulations, but a hospital that was trying to do the right thing.  At most, Relators' allegations suggest negligence in training staff regarding the regulations, but the FCA's "mens rea requirement is not met by mere negligence or even gross negligence."  *Harman*, 872 F.3d at 657.

Relators allege that the Hospital's CFO, Ms. Turley, "personally approved" the Hospital's practice of changing admission status after patient discharge, but they allege only that Dr. Hernandez told Relator Mendez that Ms. Turley said to "Just go ahead and bill it, we will be ok."  AC ¶ 212.  They do not allege the details of the conversation in which Ms. Turley allegedly made that statement—because they were not part of the conversation—and do not allege that she knew or acted with reckless indifference that any particular bill was incorrect but decided to bill it to the government.  Given the lack of detail in Relators' allegations, it is just as plausible that she made that statement (if at all) because she believed the particular circumstances permitted the unidentified billings.  Thus, their allegations do not even meet the Rule 8(a) pleading standard, much less the Rule 9(b) particularity standard.  *See Twombly*, 550 U.S. at 570 (Rule 8 requires that a complaint "state a claim to relief that is plausible on its face").

### 4.    Relators do not plead that any false claim was "material."

Relators also fail to allege facts showing that any claims that allegedly were false under the Admission Status Theory were material to Government payment decisions.  Relators' allegations of materiality are again limited to the same conclusory invocations of the legal standard, with no supporting factual allegations of any kind.  *See* Part II.A.4, *supra*.  Nor do Relators make any specific allegation that the Government would have refused to pay outpatient claims due to any alleged failure to comply with the technical requirements of Condition Code 44.  Counsel is aware of no FCA case that has been brought on the basis of failure to comply with Condition Code 44.  *See United States ex rel. Payton v. Pediatric Servs.*, 2017 WL

3910434, at *10 (S.D. Ga. Sept. 6, 2017) (dismissing claim where relator "neither addresses whether the Defendants certified compliance with the regulations nor alleges why [compliance with particular healthcare regulation] is material to the Government's decision to pay a claim").

Nor could Relators make such allegations. For one, the Amended Complaint makes clear that multiple government agencies were aware of Relators' allegations even before they filed their complaint, AC ¶¶ 23, 242–43, but there is no allegation that the Government decided not to pay DHR's claims either before or after the filing of the complaint. *Patel*, 792 F. App'x at 301 (materiality inquiry "turn[s] on whether the government would pay the claim or not if it knew of the claimant's violation"). The Government's continued payment in the face of knowledge of Relators' allegations alone forecloses a materiality finding. Also, as discussed, Relators allege that the "majority of admission status changes were to downgrade the patient from inpatient status to … outpatient status," AC ¶ 204, which means the Government would have been billed *less* for those patient stays as a result of the change, which underscores the lack of materiality.

## C.     Relators Do Not Sufficiently Plead the Loan and Remuneration Theories.

Relators' Loan and Remuneration Theories, which they base on allegations that DHR made improper loans and gave other remuneration to doctors, *id.* ¶ 4; *see id.* ¶¶ 213–26, are predicated on a theory that DHR submitted claims for payment that were "false" because they were tainted by AKS and Stark Law violations. *Cf. Ruscher*, 663 F. App'x at 373 (at summary judgment, FCA claim alleging false certification of compliance with the AKS, requires evidence that the defendant "violated the AKS"). In general, the AKS is a criminal statute that prohibits kickbacks in return for steering Medicare or Medicaid patients to particular goods or services. 42 U.S.C. § 1320a-7b(b)(1). The Stark Law prohibits an "entity" from presenting claims for payment that were "furnished pursuant to a referral" made by a "physician" who "has a financial relationship with" the entity. 28 U.S.C. § 1395nn(a)(1). The Stark Law also prohibits a

"hospital (or any owner or investor in the hospital)" from "directly or indirectly guarantee[ing] a loan … for any individual physician owner or investor or group of physician owners or investors that is related to acquiring any ownership or investment interest in the hospital."  42 U.S.C. § 1395nn(i)(1)(D)(iv).

Because Relators fail entirely to plead the alleged AKS and Stark Law violations, their FCA claims based on those statutes also fail.  *See United States v. Choudhry*, 262 F. Supp. 3d 1299, 1307 (M.D. Fla. 2017) (to state an FCA claim premised on alleged AKS violations, "Relator must allege the kickback scheme with particularity under Rule 9(b)").

### 1.     Relators do not plead that DHR offered remuneration in exchange for referrals.

Relators' Loan and Remuneration Theories fail because they do not plead any particular details about the remuneration DHR allegedly offered, the doctors involved, or any false claim submitted.  *Nunnally*, 519 F. App'x at 893, 895; *Grubbs*, 565 F.3d at 190.

Relators allege that DHR "indirectly" provided loans to physicians to fund their investment in the Hospital through a local bank, Lone Star National Bank ("LSNB").  AC ¶ 218. But they do not allege a single fact supporting the allegation that DHR had any involvement in LSNB's loans:  they do not plead which doctors received such loans, when such loans were made, which patients the doctors referred to the Hospital for treatment because of the loans, whether such patients were federally or state insured, or that DHR submitted any false claims as a result.  *See United States v. HPC Healthcare, Inc.*, 723 F. App'x 783, 790 (11th Cir. 2018) (affirming dismissal where AKS and Stark Law theories did not "identify a single individual . . . who made a referral . . . in exchange for a benefit, a single patient that was improperly referred" or "when those exchanges took place).  Relators therefore fail to plead that DHR offered "remuneration" in violation of the AKS or received "referrals" in violation of Stark.  *See United*

*States ex rel. King v. Solvay Pharms.*, 871 F.3d 318, 332 n.12 (5th Cir. 2017) ("AKS liability is limited to prescriptions that were reimbursed by the government, not private parties."); *United States v. Catholic Health Initiatives*, 312 F. Supp. 3d 584, 599 (S.D. Tex. 2018).

Relators also allege that DHR offered "other remuneration … includ[ing] lavish entertainment of physicians," AC ¶ 226, but do not allege what specifically was offered, by whom, to whom, when it was offered, or what was requested in exchange.  Critically, they do not allege that, as a result of this "lavish entertainment," any doctor ever made a single improper referral, much less that DHR submitted false or fraudulent claims to the Government as a result of any tainted referrals.[10]  *See HPC Healthcare*, 723 F. App'x at 790 (affirming dismissal where AKS and Stark Law theories did not "identify a single individual . . . who made a referral . . . in exchange for a benefit, a single patient that was improperly referred" and "when those exchanges took place"); *King*, 871 F.3d at 332 (affirming summary judgment where "it would be speculation to infer" that the alleged remuneration "actually caused the physicians to prescribe"); *Thompson v. LifePoint Hosp.*, 2013 WL 5970640, at *5 (W.D. La. Nov. 8, 2013).

### 2.   Relators do not plead that DHR acted with criminal intent.

As a criminal statute, the AKS carries a high standard of *mens rea*, requiring proof that the defendant acted "knowingly and willfully."  42 U.S.C. § 1320a-7b(b)(1).  This means that Relators must allege that DHR acted "voluntarily and purposely with the specific intent to do something the law forbids."  *United States v. Davis*, 132 F.3d 1092, 1094 (5th Cir. 1998).  Relators, however, do not even purport to allege that DHR (or anyone else) had such intent.  *See* AC ¶¶ 213–26.  There

---

[10] Relators' allegations regarding a "referral" hypothesize the existence of unidentified referrals by DHR to physicians or entities who themselves provided, and billed for, those services.  *See* AC ¶¶ 222–25.  But the Stark Law does not apply to such referrals.  *See United States v. Ctr. for Diagnostic Imaging, Inc.*, 787 F. Supp. 2d 1213, 1225 (W.D. Wash. 2011) (dismissing FCA claim premised on Stark Law where "the physician groups billed and received reimbursements" for the services, rather than the defendant), *amended on reconsideration in part,* 2011 WL 13353774 (W.D. Wash. Apr. 25, 2011).

is no allegation that anyone offered a loan, entertainment, or anything else with the required intent.

Nor do Relators make any allegation that DHR acted with the intent "to induce" referrals of federal business.  42 U.S.C. § 1320a-7b(b)(2).  Relators assert that the alleged remuneration was offered "to ensure and maintain high patient referral rates to DH[R]."  AC ¶ 260.  But, absent details about what was offered, when, by whom, to whom, and for what in return, Relators have not pled an AKS (or Stark) violation.  *See Patel*, 792 F. App'x at 299 (affirming dismissal where "nothing ties the allegedly high payment for physician shares to any inducement of referrals").

## III.     RELATORS FAIL TO PLEAD A CONSPIRACY TO VIOLATE THE FCA.

Relators' conspiracy claim is premised on the same alleged theories as their other FCA claims and fails for the same reasons.  *See United States ex rel. King v. Solvay S.A.*, 823 F. Supp. 2d 472, 516 (S.D. Tex. 2011) (dismissing FCA conspiracy claims for the same reasons as the analogous affirmative FCA claims), *vacated in part on other grounds*, 2012 WL 1067228 (S.D. Tex. Mar. 28, 2012).  The conspiracy claim against DHR also fails for two additional reasons: (1) the intracorporate conspiracy doctrine bars such a theory, and (2) Relators do not plead any element of any alleged conspiracy with the particularity demanded by Rule 9(b).

### A.     DHR Cannot Conspire with Itself.

One of Relators' alleged conspiracies rests on the allegation that "all levels of [DHR's] management" conspired among themselves.  AC ¶¶ 232–33, 275–76.  But it is well-established under the FCA that "a corporation cannot conspire with itself, no matter how many of its agents participated in the wrongful action."  *United States v. Lakeway Reg'l Med. Ctr.*, 2020 WL 6146571, at *3 (W.D. Tex. Feb. 13, 2020); *accord United States ex rel. Ligai v. ETS-Lindgren Inc.*, 2014 WL 4649885, at *15 (S.D. Tex. Sept. 16, 2014).  Where, as here, "all of the defendants are members of the same collective entity, no claim of conspiracy can be sustained against them."  *Gambrel v. Walker Cnty.*, 2019 WL 1057405, at *4 (S.D. Tex. Mar. 6, 2019).

**B.      Relators Do Not Plead a Conspiracy Between DHR and Anyone Else.**

Relators' other alleged conspiracies also fail to state a claim because Relators do not

plead with particularity either element of an FCA conspiracy:  "(1) the existence of an unlawful

agreement between defendants to get a false or fraudulent claim allowed or paid by the

government;" or "(2) at least one act performed in furtherance of that agreement."  *United States*

*ex rel. Dekort v. Integrated Coast Guard Sys.*, 705 F. Supp. 2d 519, 548 (N.D. Tex. 2010).

*First*, Relators allege a conspiracy to "utilize an exclusive referral system," apparently

between DHR and "the Referral Defendants."  AC ¶ 234.  The term "Referral Defendants" is not

defined in the Amended Complaint.  Relators' failure even to identify who DHR is accused of

conspiring with is by itself a sufficient reason to dismiss this allegation.  *See Ligai*, 2014 WL

4649885, at *15 ("allegation about 'other unknown' conspirators is too general and conclusory to

state a claim").  Nor do Relators identify or describe any "act performed in furtherance" of any

agreement between DHR and these supposed "defendants."  *Dekort*, 705 F. Supp. 2d at 548.

*Second*, Relators allege a conspiracy between DHR and the "Medical Device

Defendants."  AC ¶ 278.  But Relators make only conclusory allegations regarding the existence

of a conspiracy.  They do not plead any facts suggesting the existence of an agreement to violate

the law between anyone at EKR Therapeutics or Chisei and DHR.  *See United States ex rel.*

*Fields v. Bi-State Dev. Agency*, 2015 WL 5158398, at *7 (E.D. Mo. Sept. 2, 2015) (dismissing

FCA conspiracy claim where relator did not allege "the identities of anyone making such an

agreement, when it was made, the content of the agreement, or any other specifics as required by

Rule 9(b)").  Nor do Relators identify any act taken in furtherance of such an agreement.  *See*

*Dekort*, 705 F. Supp. 2d at 548 (*sua sponte* dismissing FCA conspiracy claim where there were

"no[] allegations of any overt acts taken in furtherance of a conspiracy").

*Third*, Relators allege that DHR conspired with LSNB "through a scheme whereby

[DHR] and some of its physician investors directly or indirectly provided loans to DHR physician investors to invest in DHR," and that DHR separately conspired with certain doctors along the same lines, AC ¶¶ 277, 279.  Yet again, Relators do not plead that DHR and LSNB entered into any agreement to provide impermissible loans, or that DHR and doctors entered into any agreement about them.  Should Relators suggest that any alleged common ownership between LSNB and DHR can establish such an agreement, they are wrong.  *See Delectable Brands v. Yogurtlab USA*, 2017 WL 3676028, at *10 (N.D. Ala. Aug. 25, 2017) (dismissing claim; plaintiff failed to allege facts "that a conspiratorial agreement . . . occurred among the various separate corporate defendants" and the "allegation that [one person] founded and manages all of them by itself does not show that plausible conspiratorial agreement").

## IV.    RELATOR RUSHING HAS FAILED TO STATE A RETALIATION CLAIM.

Relator Rushing's retaliation claim, AC ¶¶ 235–250, 314–316, should be dismissed because she failed to plead each of the three elements of an FCA retaliation claim:  that (1) she "engaged in protected activity," (2) DHR "knew about the protected activity," and (3) DHR "retaliated ... because of [the] protected activity."  *King*, 871 F.3d at 332.

*First*, Relator Rushing does not allege that she was engaged in a "protected activity." The FCA's retaliation provision protects those who "specifically investigated or complained about the employer making false claims for federal funds."  *Bouknight v. Hous. Indep. Sch. Dist.*, 2008 WL 110427, at *4 (S.D. Tex. Jan. 8, 2008).  But Rushing does not allege that she reported any "false or fraudulent claims for payment submitted to the government," as she must "[f]or internal complaints to constitute protected activity."  *United States ex rel. Patton v. Shaw Servs. LLC*, 418 F. App'x 366, 372 (5th Cir. 2011); *see also Bouknight*, 2008 WL 110427, at *4 ("A plaintiff must do more than … complain about an employer's improper conduct.").  Instead, she alleges that she complained, including to Texas state agencies, that DHR was not following

proper billing procedures or maintaining proper documentation.  AC ¶¶ 238–48.  Nowhere does

she allege, however, that she complained that anyone at DHR knowingly violated Medicare

billing procedures and nevertheless submitted claims for payment known to be false or

fraudulent.  Absent such allegations, Relator's sporadic complaints about business practices do

not constitute a "protected activity."  *See Bennett*, 2011 WL 1231577, at *34; *United States ex*

*rel. Davis v. Prince*, 2010 WL 2679761, at *4 (E.D. Va. July 2, 2010).

 *Second*, Rushing fails to allege facts indicating that DHR knew she was engaged in any

protected activity.  She must allege that DHR "was on notice of the distinct possibility of *qui tam*

litigation."  *United States ex rel. Gonzalez v. Fresenius Med. Care N. Am.*, 748 F. Supp. 2d 95,

104 (W.D. Tex. 2010).  Rushing pleads nothing of the sort.  Her reports of compliance concerns

therefore could not have put DHR on notice.  *See United States ex rel. Gray v. Lockheed Martin*

*Corp.*, 2010 WL 672017, at *4 (E.D. La. Feb. 19, 2010).

 *Third*, in light of her failure to plead that she engaged in any protected conduct, or that

DHR knew about such conduct, Rushing necessarily fails to allege that DHR "discriminated

against [her] because she engaged in protected activity."  *United States ex rel. Barrett v.*

*Columbia Healthcare Corp.*, 2005 WL 1924187, at *12 n.13 (S.D. Tex. Aug. 10, 2005).

## V. AMENDMENT IS FUTILE.

 The Court should dismiss the Amended Complaint with prejudice because any

amendment would be futile.  The myriad legal defects in Relators' claims cannot be overcome

with additional pleading.  *See Porter*, 810 F. App'x at 243 (leave to amend futile; legal defects in

FCA claim meant that "there is no reasonable basis to predict that Plaintiff-Appellant can recover

on her claims").  Nor can Relators overcome their failure to plead their claims with particularity.

Relators have had more than ten years to investigate these claims, yet their 2021 Amended

Complaint is as lacking in factual detail as their original complaint filed in 2011.  If Relators

cannot provide enough detail to plead a single FCA theory with particularity now—more than 12 years after Relators began their employment at the Hospital and 10 years after they first filed their Complaint—they are unable to do so.  *See United States ex rel. Crennen v. Dell Mktg. LP*, 711 F. Supp. 2d 157, 164 (D. Mass. 2010) (dismissing with prejudice; "after three years and a government investigation," the relator "still cannot allege" specific false claims).

## CONCLUSION

Relators' Amended Complaint should be dismissed in its entirety, with prejudice.[11]

---

[11] DHR and RGV reserve the right to adopt, join, and incorporate by reference any arguments made by any other defendant in its motion to dismiss.

Dated:  May 10, 2021                    Respectfully submitted,


                                        WILLIAMS & CONNOLLY LLP
                                        /s/ *Ashley W. Hardin*
                                        Enu Mainigi
                                             Attorney-in-Charge
                                             S.D. Tex. Bar # 2357311
                                             D.C. Bar # 454012
                                        Ashley W. Hardin
                                             S.D. Tex. Bar # 2449547
                                             D.C. Bar # 482251
                                        725 Twelfth Street N.W.
                                        Washington, DC 20005
                                        (202) 434-5000
                                        *emainigi@wc.com*
                                        *ahardin@wc.com*

                                        *Attorneys for Defendants Doctors Hospital at*
                                        *Renaissance, Ltd. and RGV Med, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on the 10th day of May, 2021, a copy of the foregoing was filed electronically.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF system.

<u>/s/ Ashley W. Hardin</u>
Ashley W. Hardin
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, DC 20005
Telephone: (202) 434-5000
Facsimile: (202) 434-5029
E-mail: ahardin@wc.com