# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| *ex rel.* Donna Mendez & Selina Rushing and | § | |
| Selina Rushing, Individually; | § | |
| | § | |
| | § | |
| STATE OF TEXAS *ex rel.* | § | Case No. 4:11-cv-02565 |
| Donna Mendez & Selina Rushing, | § | |
|     Plaintiffs, | § | |
| v. | § | |
| | § | |
| Doctors Hospital at Renaissance, Ltd., *et al.* | § | |
|     Defendants. | § | |
| | § | |

## DEFENDANTS LONE STAR NATIONAL BANK'S AND
## LONE STAR NATIONAL BANCSHARES-TEXAS, INC.'S
## MOTION TO DISMISS RELATORS' FIRST AMENDED COMPLAINT

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................ iv

I.    INTRODUCTION ..................................................................................................1

II.   NATURE AND STAGE OF PROCEEDING ..........................................................2

III.  FACTUAL ALLEGATIONS ..................................................................................3

IV.   STATEMENT OF ISSUES ....................................................................................5

V.    STANDARD OF REVIEW ....................................................................................5

    A.    Rule 12(b)(6) ............................................................................................5

    B.    Rule 9(b) ..................................................................................................6

    C.    Rule 12(b)(1) ............................................................................................6

VI.   ARGUMENT .........................................................................................................7

    A.    The Complaint fails to state a claim under the False Claims Act and fails to plead the alleged fraud by the Bank with particularity. ...........................7

        1.    Relators have not sufficiently pleaded an AKS-based FCA claim. ............8

            a.    Relators have not sufficiently pleaded that the Bank offered kickbacks ...............................................................................8

            b.    Relators have not sufficiently pleaded the Bank's unlawful intent. ..................................................................................11

            c.    Relators have not sufficiently pleaded the existence of a single false claim that resulted from the supposedly-induced referrals. ...........................................................................12

        2.    Relators have not pleaded a cognizable claim for a Stark Law violation. .............................................................................................14

            a.    The Stark Law does not apply to the Bank as a matter of law. ......................................................................................14

            b.    Relators cannot plead around the fact that the Stark Law does not apply to the Bank with insufficient allegations that the Bank "caused" a Stark Law violation. ...........................15

        3.    Relators do not plausibly allege that the Bank violated the False Claims Act. ..............................................................................15

            a.    Relators fail to sufficiently plead that the Bank "knowingly" caused the submission of false claims. ...........................16

            b.    Relators fail to sufficiently plead that the Bank *caused* the submission of false claims. ...........................................16

           c.     Relators fail to sufficiently plead that any false claim was "material" to the Government's payment decisions. ....................17

           d.     Relators' Stark-predicated FCA claims are time-barred...............17

  B.    Relators Fail to Plead with Particularity Elements of a Conspiracy to Violate the FCA ...............................................................................................18

  C.    The FCA's Public-Disclosure Bar Precludes This Action....................................19

     1.    The key transactions underlying Relators' claims against the Bank were publicly disclosed in "administrative reports," "Federal Reports," and "from the news media" before Relators filed their Amended Complaint. ...............................................................................20

           a.     Cantu's ownership interest in DHR and LSNB was publicly disclosed in annual reports submitted to federal agencies and in online articles....................................................................................22

           b.     Information regarding loans made to physicians for the purpose of investing in DHR is publicly available on the Texas Secretary of State's website. ...............................................25

     2.    Relators are not the original source of this information. ..........................26

VII.   CONCLUSION.......................................................................................................................29

     CERTIFICATE OF SERVICE .............................................................................................30

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*A-1 Ambulance Serv., Inc. v. California,*
202 F.3d 1238 (9th Cir. 2000) ...........................................................................27

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009)...........................................................................................5

*Basic Capital Mgmt., Inc. v. Dynex Capital, Inc.,*
976 F.3d 585 (5th Cir. 2020) .............................................................................23

*Bell Atl. Corp. v. Twombly,*
550 U.S. 544 (2007)........................................................................................5, 29

*Campbell v. City of San Antonio,*
43 F. 3d 973 (5th Cir. 1995) ...............................................................................6

*United States ex rel. Colquitt v. Abbott Labs,*
864 F. Supp. 2d 499 (N.D. Tex. 2012) ...........................................................22, 23

*United States ex rel. Dekort v. Integrated Coast Guard Sys.,*
705 F. Supp. 2d 519 (N.D. Tex. 2010) ................................................................18

*Funk v. Stryker Corp.,*
631 F.3d 777 (5th Cir. 2011) .............................................................................23

*U.S. ex rel. Gage v. Davis S.R. Aviation, L.L.C.,*
623 Fed. Appx. 622 (5th Cir. 2015).....................................................................9

*Graham Cnty. Soil & Water Conservation Dist. v. United States ex rel. Wilson,*
559 U.S. 280 (2010).........................................................................................22

*Green v. AmerisourceBergen Corp.,*
2017 WL 1209909 (S.D. Tex. Mar. 31, 2017) (Hoyt, J.) .............................. *passim*

*Gregory v. Houston Indep. Sch. Dist.,*
2016 WL 5661701 (S.D. Tex. Sept. 30, 2016) .......................................................9

*United States ex rel. Grubbs v. Kanneganti,*
565 F.3d 180 (5th Cir. 2009) ...........................................................................6, 18

iv

*United States ex rel. Hebert v. Dizney,*
  295 F. App'x 717 (5th Cir. 2008) ..........................................................................9, 13

*United States ex rel. Hendrickson v. Bank of Am., N.A.,*
  343 F. Supp. 3d 610 (N.D. Tex. 2018), *aff'd*, 779 F. App'x 250 (5th Cir. 2019)...............7, 20

*United States ex rel. Integra Med Analytics, L.L.C. v. Baylor Scott & White Health,*
  816 F. App'x 892 (5th Cir. 2020), *cert. denied*, 141 S. Ct. 905, 208 L. Ed. 2d
  458 (2020) ....................................................................................................6, 12

*United States ex rel. Jamison v. McKesson Corp.,*
  649 F.3d 322 (5th Cir. 2011) .......................................................................1, 20, 26

*United States ex rel. Jamison v. McKesson Corp.,*
  900 F. Supp. 2d 683 (N.D. Miss. 2012)....................................................................10

*United States ex rel. King v. Alcon Labs., Inc.,*
  232 F.R.D. 568 (N.D. Tex. 2005) .......................................................................12, 14

*United States ex rel. King v. Solvay S.A.,*
  823 F. Supp. 2d 472 (S.D. Tex. 2011), *vacated on other grounds*, 2012 WL
  1067228 (S.D. Tex. Mar. 28, 2012) ........................................................................19

*Klaczak v. Consol. Med. Transp.,*
  458 F. Supp. 2d 622 (N.D. Ill. 2006) ......................................................................10

*United States ex rel. Lam v. Tenet Healthcare Corp.,*
  481 F. Supp. 2d 673 (W.D. Tex. 2006)......................................................................23

*United States ex rel. Lemon v. Nurses To Go, Inc.,*
  924 F.3d 155 (5th Cir. 2019) ................................................................................17

*United States ex rel. Mateski v. Raytheon Co.,*
  816 F.3d 565 (9th Cir. 2016) ................................................................................20

*United States ex rel. Maur v. Hage-Korban,*
  981 F.3d 516 (6th Cir. 2020) ................................................................................22

*MDPhysicians & Assocs., Inc. v. State Bd. of Ins.,*
  957 F.2d 178 (5th Cir. 1992) ..................................................................................7

*United States ex rel. Moore & Co., P.A. v. Majestic Blue Fisheries, LLC,*
  812 F.3d 294 (3d Cir. 2016)..................................................................................28

*United States ex rel. Nunnally v. W. Calcasieu Cameron Hosp.*,
  519 F. App'x 890 (5th Cir. 2013) ........................................................................13

*United States ex rel. Osheroff v. Humana Inc.*,
  776 F.3d 805 (11th Cir. 2015) ............................................................................28

*United States ex rel. Parikh v. Citizens Med. Ctr.*,
  977 F. Supp. 2d 654 (S.D. Tex. 2013), *aff'd sub nom. United States ex rel.*
  *Parikh v. Brown*, 587 F. App'x 123 (5th Cir. 2014).................................8, 11, 15

*United States ex rel. Reagan v. E. Tex. Med. Ctr. Reg'l Healthcare Sys.*,
  384 F.3d 168 (5th Cir. 2004) ..................................................................... *passim*

*Riley v. St. Luke's Episcopal Hosp.*,
  252 F.3d 749 (5th Cir. 2001) (Smith, J., dissenting) ...............................................1

*Rio Grande Royalty Co. v. Energy Transfer Partners, L.P.*,
  620 F.3d 465 (5th Cir. 2010) ...............................................................................29

*Rockwell Int'l Corp v, United States*,
  549 U.S. 457 (2007).................................................................................................5

*United States ex rel. Ruscher v. Omnicare, Inc.*,
  2014 WL 2618158 (S.D. Tex. June 12, 2014), 2014 WL 4388726 (S.D. Tex.
  Sept. 5, 2014) .................................................................................8, 12, 16

*Schindler Elevator Corp. v. United States ex rel. Kirk*,
  563 U.S. 401 (2011)...............................................................................................21

*United States. ex rel. Schumann v. Astrazeneca Pharm. L.P.*,
  769 F.3d 837 (3d Cir. 2014)..................................................................................26

*Simms v. Jones*,
  2011 WL 5978594 (N.D. Tex. Nov. 30, 2011)......................................................23

*United States ex rel. Springfield Terminal Ry. Co. v. Quinn*,
  14 F.3d 645 (D.C. Cir. 1994) ...............................................................................21

*United States ex rel. Steury v. Cardinal Health, Inc.*,
  625 F.3d 262 (5th Cir. 2010) .................................................................................7

*United States ex rel. Steury v. Cardinal Health, Inc.*,
  735 F.3d 202 (5th Cir. 2013) .................................................................................6

*United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*,
  125 F.3d 899 (5th Cir. 1997) ...............................................................................13

*United States v. Abbott Labs.*,
    2016 WL 80000 (N.D. Tex. Jan. 7, 2016) ...........................................................................16

*United States v. Catholic Health Initiatives*,
    312 F. Supp. 3d 584 (S.D. Tex. 2018), *aff'd*, 792 F. App'x 296 (5th Cir. 2019) ........... *passim*

*United States v. Garman*,
    719 F. App'x 459 (6th Cir. 2017) .............................................................................................28

*Vantage Trailers, Inc. v. Beall Corp.*,
    567 F.3d 745 (5th Cir. 2009) .....................................................................................................6

*United States ex rel. Vavra v. Kellogg Brown & Root, Inc.*,
    848 F.3d 366 (5th Cir. 2017) ...................................................................................................17

*Voorhees v. Kelsey-Seybold Clinic, P.A.*,
    2021 WL 742887 (S.D. Tex. Jan. 29, 2021), 2021 WL 737122 (S.D. Tex. Feb.
    25, 2021) ......................................................................................................................................6

*Wercinski v. Int'l Bus. Machines Corp.*,
    982 F. Supp. 449 (S.D. Tex. 1997) .........................................................................................19

*United States ex rel. Winkelman v. CVS Caremark Corp.*,
    827 F.3d 201 (1st Cir. 2016) ...................................................................................................28

*United States ex rel. Wuestenhoefer v. Jefferson*,
    105 F. Supp. 3d 641 (N.D. Miss. 2015) .................................................................................17

**Rules and Statutes**

31 U.S.C. § 3729(a)(1)(A)–(B) ......................................................................................................16

31 U.S.C. § 3730(e)(4)(A) ....................................................................................................19, 20, 21

31 U.S.C. § 3730 (e)(4)(B) ..................................................................................................26, 27, 28

42 U.S.C. § 1320a–7b(b)(2) ..............................................................................................................8

42 U.S.C. § 1395nn(i)(1)(D)(iii)–(iv) ............................................................................................14

False Claims Act ............................................................................................................... *passim*

Fᴇᴅ. R. Cɪᴠ. P. 8(a) ..................................................................................................................1, 6

Fᴇᴅ. R. Cɪᴠ. P. 9(b) ............................................................................................................. *passim*

Fᴇᴅ. R. Cɪᴠ. P. 12(b)(6) .................................................................................................5, 6, 19, 29

FED. R. CIV. P. 12(h)(3) ........................................................................................................5, 6

FED. R. EVID. 201 ...................................................................................................................23

# I.    INTRODUCTION[1]

This is a nearly ten-year-old *qui tam* suit in which the United States and the State of Texas have twice declined to intervene.[2]   Buried within Relators' Amended Complaint—which focuses on purported improper billing, admissions, and treatment allegedly discovered by Relators during their employment as nurses at Doctor's Hospital at Renaissance ("DHR")—lies a vague and conclusory allegation of healthcare fraud by a bank.   Based solely on the fact that DHR and Lone Star National Bank ("LSNB"), through its parent company, Lone Star National Bancshares-Texas, Inc. ("Bancshares")[3] (together the "Bank"), have investors in common, Relators claim that loans offered by the Bank to physician customers were "indirectly" made by DHR to incentivize referrals in violation of the Stark Law and the Anti-Kickback Statute ("AKS").   Based on this mere say-so, Relators make the tremendous leap that the Bank is liable under the False Claims Act ("FCA") for causing the submission of Medicare and Medicaid claims rendered false by the existence of these loans.   But Relators' imaginative allegations utterly fail to meet the pleading requirements of Rule 8(a), much less the Rule 9(b) requirement of heightened particularity for allegations of fraud.   Far from detailing the required "who, what, when, where, and how" of the Bank's alleged fraud,

---

[1] The length of this Motion is dictated by the vague and conclusory allegations of the now-Amended Complaint, as well as Defendants' desire to cover every potential issue and leave no doubt with this Court that the entire Complaint is deficient and should be dismissed with prejudice.

[2] The Fifth Circuit has shown healthy skepticism when it comes to non-intervened FCA cases. *See, e.g.*, *United States ex rel. Jamison v. McKesson Corp.*, 649 F.3d 322, 331 (5th Cir. 2011) (stating that actions against certain defendants "presumably lacked merit" due to government's decision not to intervene in said actions); *Riley v. St. Luke's Episcopal Hosp.*, 252 F.3d 749, 767 n.24 (5th Cir. 2001) (Smith, J., dissenting) (observing that "the cases in which the government declines to intervene are generally the meritless cases").

[3] Lone Star National Bank is a wholly owned subsidiary of Lone Star National Bancshares-Texas, Inc.  Any reference to a "shareholder" or "investor" in the "Bank" is a reference to such individual being a shareholder in Bancshares which, in turn, owns and operates the Bank.

Relators' 332-paragraph complaint dedicates only nine paragraphs to allegations involving the Bank and fails to identify a *single* loan, a *single* physician who received such a loan, a *single* referral made to DHR as a result of such a loan, or a *single* claim that was submitted to a federal healthcare payor program rendered false or fraudulent due to such a loan.  Moreover, Relators fail to offer factual allegations to support their conclusion that loans made by the Bank were actually made indirectly by DHR, much less that they amounted to kickbacks in exchange for referrals. Relators do not even attempt to plead facts regarding the Bank's scienter, how the Bank "caused" the submission of false claims, or how any claim was material to the government's payment decisions.  Accordingly, Relators do not plausibly allege the requisite elements of an FCA claim, an AKS violation or a Stark Law violation.  Instead, Relators' complaint demonstrates that they lack the personal knowledge necessary to allege what actions the Bank took, let alone the details of "who, what, when, where and how."  This is no surprise given Relators do not claim that they ever worked at the Bank, reviewed Bank files, or discussed Bank loans with DHR physicians or Bank employees.  Rather, the few allegations Relators make about the Bank concern the common investors with DHR and information that was already publicly known—through news articles and publication on Government websites—and for which Relators are not original sources.  Thus, Relators' claims are also barred by the FCA's public disclosure bar.  For these reasons, the Court should dismiss Relators' claims with prejudice.

## II.    NATURE AND STAGE OF PROCEEDING

Relators filed this *qui tam* action under seal on July 12, 2011.  Dkt. 1.  The Original Complaint remained under seal while the Department of Justice, the United States Attorney's Office for the Southern District of Texas, and the State of Texas (collectively, the "Government") investigated Relators' claims.  On October 1, 2018, the United States filed a Notice of Non-Intervention, but the case was not unsealed at that time.  Dkt. 67.  In December 2020, after a

lengthy and comprehensive investigation, the Government again declined to intervene and the Original Complaint was unsealed on December 17, 2020.  Dkt. 77.

Importantly, during the course of the Government's investigation, the Bank produced more than 10,000 documents, totaling approximately 95,000 pages, including loan files and loan committee meeting minutes, in response to a subpoena from the Department of Justice.  The Bank also met with the Government in person and provided a legal and factual presentation regarding Relators' allegations.  Tellingly, following the provision of records and the in-person presentation where the Government was free to ask any questions that remained unanswered, the Department of Justice ultimately decided not to intervene.  On March 8, 2021, Relators filed their First Amended Complaint.  Dkt. 82 (the "Complaint").  On May 11, 2021, the State of Texas filed its Notice of Election to Decline Intervention.  Dkt. 107.

### III.    FACTUAL ALLEGATIONS

LSNB, an independent bank unaffiliated with DHR, has over twenty one-banking centers serving customers throughout the Rio Grande Valley and San Antonio.  Dkt. 82, ¶ 40.  Relators are two licensed registered nurses who began working at DHR in the Rio Grande Valley in the late 2000s.  *Id.* ¶¶ 8, 11. During their employment, Relators reviewed patient charts to ensure the procedures provided were medically necessary and cost-effective. *Id*. ¶ 8. Relators allege that beginning in 2009, they discovered fraudulent medical care and fraudulent billing procedures occurring at DHR. *Id*. ¶ 232.   Relators also allege that they witnessed or otherwise learned of unnecessary admissions hospital-wide, unnecessary medical treatment or procedures, and the fraudulent use of emergency helicopter transportation. *See generally id*. ¶¶ 156–185.  Relators do not plead any basis for having knowledge of the *Bank's* activities beyond information gleaned from the Bank's "annual reports and website." *Id.* ¶ 216.  Relators do not allege to having worked

at the Bank, nor to having had any contact with anyone who has worked at the Bank or has non-public information about the Bank.

Relators do not and cannot allege that LSNB is the only bank to have made investment loans to DHR physicians.  Instead, the crux of Relators' theory is that, beginning in 2010, DHR and three DHR partners (Alonzo Cantu, David Deanda, a Bank officer and shareholder, and Dr. Victor Haddad, a Bank Advisory Board member and shareholder) "indirectly" provided loans to physicians through the Bank, in violation of the Stark Law and AKS.  *See* Dkt. 82, ¶ 44.  According to Relators, the loans were "offered at better than market rates, and/or payments [were] not regularly demanded on the loans." *Id*. ¶¶ 218, 220.  Relators allege that Alonzo Cantu exercises control over the Bank by virtue of his roles as Chairman of the Board and majority shareholder. *Id*. ¶¶ 32, 47.  Citing the Bank's website, Relators allege that Cantu founded LSNB in 2003 and that Cantu and entities he owns have held ownership interests ranging from 32 to 41% in Bancshares for fifteen years. *Id*. ¶ 216. It is also publicly known that Cantu has served as LSNB's Chairman of the Board since at least 2009.  *Id*.  According to Relators, Cantu, Deanda, and Haddad "had the power to exercise a controlling influence over the management or policies of the [B]ank" and "personally participated in approving such loans and signing loan documents." *Id*. ¶ 218. Relators further allege that the loans permitted Cantu to "gain[] powerful leverage" over DHR physicians and allowed him to force doctors "to aggressively refer patients regardless of medical necessity." *Id*. ¶ 220.

Finally, Relators assert that the Bank conspired with other defendants to make claims to the Government, which were rendered false by loans made "indirectly" by DHR through the Bank.

## IV.     STATEMENT OF ISSUES

1.      Should Relators' FCA claims against the Bank be dismissed because the Complaint's allegations of purported improper lending and renumeration fail to state a claim as required by Rule 12(b)(6), and fail to plead fraud with particularity as required by Rule 9(b)?

2.      Should Relators' FCA conspiracy claim against the Bank be dismissed because the Complaint's allegations of conspiracy fail to state a claim as required by Rule 12(b)(6), and fail to plead conspiracy with particularity as required by Rule 9(b)?

3.      Should Relators' claims against the Bank be dismissed pursuant to Rule 12(b)(1)[4] for conduct arising prior to July 22, 2010, and pursuant to Rule 12(b)(6) for conduct arising after July 22, 2010 because the FCA's public disclosure bar applies to the Complaint's allegations regarding the Bank?

## V.     STANDARD OF REVIEW

### A.     Rule 12(b)(6)

Relators must plead enough facts to state a claim to relief that is plausible on its face. FED. R. CIV. P. 12(b)(6); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). This standard "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation," or "naked assertions devoid of further factual enhancement." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).[5]  Put another way, the plausibility standard requires "more than simply a sheer possibility that a defendant has

---

[4] For conduct arising prior to July 22, 2010, the FCA's public disclosure bar is jurisdictional, *see Rockwell Int'l Corp v, United States*, 549 U.S. 457, 467–68 (2007), and thus dismissal is pursuant to Rule 12(b)(1).  For conduct arising after July 22, 2010, the public-disclosure bar is not jurisdictional, and dismissal is pursuant to Rule 12(b)(6). *Green v. AmerisourceBergen Corp.*, 2017 WL 1209909, at *5 (S.D. Tex. Mar. 31, 2017) (Hoyt, J.).

[5] Unless otherwise noted, this Motion adds all emphasis in quotations, and omits from quotations all alterations, citations, and internal quotation marks.

acted unlawfully." *United States v. Catholic Health Initiatives*, 312 F. Supp. 3d 584, 594 (S.D. Tex. 2018), *aff'd*, 792 F. App'x 296 (5th Cir. 2019).  Dismissal is appropriate where a "complaint lacks an allegation regarding a required element necessary to obtain relief." *Campbell v. City of San Antonio*, 43 F. 3d 973, 975 (5th Cir. 1995).

### B.     Rule 9(b)

Claims brought under the FCA must additionally meet the heightened pleading standard of Rule 9(b).  *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 185 (5th Cir. 2009). Thus, Relator "must state with particularity the circumstances constituting fraud or mistake."  FED. R. CIV. P. 9(b).  "Rule 9(b)'s particularity requirement supplements Rule 8(a)'s demand that a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *United States ex rel. Integra Med Analytics, L.L.C. v. Baylor Scott & White Health*, 816 F. App'x 892, 897 (5th Cir. 2020), *cert. denied*, 141 S. Ct. 905, 208 L. Ed. 2d 458 (2020).  Thus, "[t]he failure of a plaintiff to plead in compliance with Rule 9(b) is considered a failure to state a claim under Rule 12(b)(6)." *Voorhees v. Kelsey-Seybold Clinic, P.A.*, 2021 WL 742887, at *3 (S.D. Tex. Jan. 29, 2021), *report and recommendation adopted*, 2021 WL 737122 (S.D. Tex. Feb. 25, 2021).  Specifically, to survive a motion to dismiss, "it is necessary to plead with particularity the who, what, when, where and how of the falsity." *United States ex rel. Steury v. Cardinal Health, Inc.*, 735 F.3d 202, 205 (5th Cir. 2013).

### C.     Rule 12(b)(1)

Federal Rule of Civil Procedure 12(b)(1) permits dismissal for lack of subject matter jurisdiction.  Because federal courts are courts of limited jurisdiction, if the court determines at any time that it lacks subject matter jurisdiction, it "must dismiss the action."  FED. R. CIV. P. 12(h)(3).  The party seeking to invoke jurisdiction has the burden of proving jurisdiction by a preponderance of the evidence. *Vantage Trailers, Inc. v. Beall Corp.*, 567 F.3d 745, 748 (5th Cir.

2009).  When evaluating jurisdiction, a federal court is "free to weigh the evidence and satisfy itself as to the existence of its power to hear the case." *MDPhysicians & Assocs., Inc. v. State Bd. of Ins.*, 957 F.2d 178, 181 (5th Cir. 1992).

## VI.   ARGUMENT[6]

Relators' Complaint stretches the False Claims Act beyond its logical limits and into territory the Government was evidently unwilling to go, as exhibited by its decision (on two occasions) to forego intervention.  In an untested theory of FCA liability, Relators attempt to hold a *bank* liable for a *hospital's* alleged submission of false healthcare claims to the government based on loans the bank offered to physicians. Relators' effort to impugn the Bank's lending activities rests entirely on the fact that the Bank and DHR allegedly have some common ownership.  But Relators' allegations lack sufficient factual detail, and amount to nothing more than a string of bald assertions and legal conclusions.  Relators fail to plead facts to support the elements of an FCA violation by the Bank, and they certainly do not plead the "who, what, where, when and how" of the purported AKS or Stark Law violations by the Bank.  Similarly, Relators fail to sufficiently plead the existence of an FCA conspiracy.  Independent of these bases for dismissal, Relators' claims against the Bank are substantially the same as transactions publicly disclosed prior to their lawsuit, and are therefore precluded by the FCA's public disclosure bar.

**A.     The Complaint fails to state a claim under the False Claims Act and fails to plead the alleged fraud by the Bank with particularity.**

Relators must plead the following elements of an FCA cause of action: "(1) a false statement or fraudulent course of conduct; (2) made or carried out with the requisite scienter; (3) that was material; and (4) that is presented to the Government." *United States ex rel. Steury v.*

---

[6] The Bank incorporates in full all arguments and authorities in the Motion to Dismiss filed by defendant Doctors Hospital at Renaissance (Dkt. 106).

*Cardinal Health, Inc.*, 625 F.3d 262, 267 (5th Cir. 2010).  Relators do not contend that the Bank directly submitted false healthcare claims to the Government, but rather that it *caused* the submission of false health-care claims by DHR by providing loans that purportedly violate the AKS and Stark Law.  Thus, in order to satisfy the first element of their FCA claim (a false statement or fraudulent course of conduct), Relators must plead with particularity a predicate AKS or Stark violation. The Complaint fails to do this, and accordingly should be dismissed.

### 1.   Relators have not sufficiently pleaded an AKS-based FCA claim.

To properly plead a predicate violation of the FCA, Relators must allege that the Bank itself knowingly and willfully offered kickbacks to DHR physicians to induce them to make referrals to be paid by federal healthcare programs.  *See* 42 U.S.C. § 1320a–7b(b)(2); *United States ex rel. Parikh v. Citizens Med. Ctr.*, 977 F. Supp. 2d 654, 662–63 (S.D. Tex. 2013), *aff'd sub nom. United States ex rel. Parikh v. Brown*, 587 F. App'x 123 (5th Cir. 2014).  In the context of AKS-based FCA claims, courts have stated that Rule 9(b) requires Relators to "allege the particular details of a scheme to offer kickbacks in order to induce referrals . . . ." *Parikh*, 977 F. Supp. 2d. at 667.  This means that Relators must "sketch" how the Bank provided remuneration, the form of that remuneration, how and why the Bank believed that remuneration would induce referrals at DHR, and how the Bank benefited from such alleged remuneration.  *See United States ex rel. Ruscher v. Omnicare, Inc.*, 2014 WL 2618158, at *10 (S.D. Tex. June 12, 2014), *on reconsideration in part*, 2014 WL 4388726 (S.D. Tex. Sept. 5, 2014).

### a.   Relators have not sufficiently pleaded that the Bank offered kickbacks.

Relators' entire case against the Bank centers on the alleged illegality of loans the Bank made to DHR physicians.  Relators allege that the investment loans and additional "compensation" the Bank provided DHR physicians are AKS-violating kickbacks.  Yet, Relators do not identify a

*single* loan (or "compensation") made to a *single* physician at a *single* point in time—stating only that loans to physicians were made "[b]eginning in 2010," a span of *11 years*. This is woefully insufficient to satisfy Rule 9(b). *See Gregory v. Houston Indep. Sch. Dist.*, 2016 WL 5661701, at *5 (S.D. Tex. Sept. 30, 2016) (allegation that "fraud occurred over a course of years spanning from at least 2005 to 2013" was insufficient to satisfy Rule 9(b)); *id.* ("In addressing the 'who' of the fraudulent scheme, the identity of the person making the misrepresentation must be stated in the complaint alleging violation of the FCA in order to satisfy Rule 9(b)."); *United States. ex rel. Gage v. Davis S.R. Aviation, L.L.C.*, 623 F. App'x 622, 627 (5th Cir. 2015) ("Gage alleges only that defendants submitted nearly $4 million of false invoices to the government between 2009 and 2011. This range is not specific enough to comply with Rule 9(b)"); *United States ex rel. Hebert v. Dizney*, 295 F. App'x 717, 722–23 (5th Cir. 2008) (allegations that defendants routinely submitted bills over the course of seven years did not "come close to satisfying" Rule 9(b)). Even after the closest reading of the Complaint, the Bank is in no position to adequately formulate its defense because it lacks notice of the basic details of the purported loan scheme, including: which physicians received a purportedly improper loan; when the improper loans were initiated; the terms of the improper loans; whether said physicians actually referred any patients to DHR as a result of such loan; or whether any claims were submitted by DHR as a result of such referrals. *See Green v. AmerisourceBergen Corp.*, 2017 WL 1209909, at *4 (S.D. Tex. Mar. 31, 2017) (Hoyt, J.) ("Rule 9(b) has four purposes: to ensure that the defendant has sufficient information to formulate a defense by having notice of the conduct complained of; to protect defendants against frivolous suits; to eliminate fraud actions in which all the facts are learned after discovery; and to protect defendants from undeserved harm to their goodwill and reputation.").

The only facts offered in support of Relators' conclusion that the loans are illegal kickbacks are that the loans are allegedly "offered at better than market rates, ***and/or*** payments are not regularly demanded on the loans."  Dkt. 82, ¶¶ 218, 220.  Relators do not specify which of these terms apply to which loans, or if all loans are tainted by both allegedly improper terms.  Relators offer no personal knowledge supporting their bald assertion that the Bank does not "regularly demand[]" payment on the loans, or their claim that LSNB's loans to DHR physicians are "offered at better than market rates."  For instance, Relators do not allege that they worked at the Bank, reviewed Bank documents, or spoke to DHR physicians or Bank employees about the terms of any of these loans.  Relators provide no information about how they allegedly came to discover the existence of the loans and their allegedly improper terms.

Relators also provide no information on what they claim the "market rate" is or was at any given time, or how the loans depart from such "market rate."  Relators fail to provide *any* information as to how the loans depart from the market rate at the time that the loan was made, such as comparing how the interest rates, repayment terms, creditworthiness requirements, collateral requirements, or other important features of the loans *compare* to loans offered by other banks or by LSNB to its other customers.  Relators must do this in order to establish that the loans were kickbacks—or anything of value—under the AKS.  *See United States ex rel. Jamison v. McKesson Corp.*, 900 F. Supp. 2d 683, 699 (N.D. Miss. 2012) ("In the context of the AKS, courts use 'fair market value' as the gauge of value when assessing the remuneration element of the offense."); *Klaczak v. Consol. Med. Transp.*, 458 F. Supp. 2d 622, 678–79 (N.D. Ill. 2006) ("In the case *sub judice*, the only alleged remuneration is a 'discount' for services, which raises the critical question—a discount compared to what? . . . Relators cannot prove that the Hospital Defendants received remuneration—something of value—without comparing the contracted rates

with fair market value."). Relators have not plausibly alleged the existence of a kickback under the AKS.

> **b.** **Relators have not sufficiently pleaded the Bank's unlawful intent.**

Relators fail to plausibly allege that the Bank willfully paid kickbacks with the unlawful intent to induce referrals to DHR. "Willfulness . . . entails a specific intent to do something the law forbids; that is to say, a bad purpose either to disobey or disregard the law." *Catholic Health Initiatives*, 312 F. Supp. 3d at 595. And, because "the AKS's inducement element [is] an intent requirement," *Parikh*, 977 F. Supp. 2d at 665, Relators must plausibly allege that the Bank made the loans (the supposed kickback) with the intent "to induce referrals from the physician investors." *Catholic Health Initiatives*, 312 F. Supp. 3d at 596.

Relators plead zero facts alleging that the Bank was motivated by an unlawful purpose (i.e., inducing illegal referrals) in making the loans. The Bank legitimately and routinely lends money to individuals and businesses in South Texas. In fact, that is the core of the Bank's business. The Bank's intent in making loans to DHR physicians is the same as for *any other Bank customer*: to make money on interest and fees. There are many commercially sound reasons why the Bank would offer loans to DHR physicians at competitive rates and terms (if in fact such loans were at more competitive rates and terms, which is not conceded by the Bank)—reasons that have nothing to do with a "specific intent to do something the law forbids." *Id*. at 595. Physicians are generally attractive customers, tending to be higher-income and higher-net-worth individuals, with more robust sources of collateral, and the ability to serve as long-term "repeat customers" for both personal and business banking needs. Relators plead no facts plausibly alleging that the Bank was motivated by anything other than this lawful purpose. For example, Relators have not alleged that the Bank's application process for DHR-physician loans involves collecting and reviewing referral

11

volumes, that a DHR physician's loan terms (such as interest rates) are tied to referral volumes, that referral volumes are discussed within LSNB Loan Committee meetings in connection with approving loans to DHR physicians, or that the Bank has access to any DHR internal records showing physicians' referral activity.  Relators' allegations also do not describe why or how the Bank would stand to benefit from inducing physician referrals for DHR.

Without any such factual allegations, the Bank's allegedly unlawful conduct—making loans to customers—is entirely consistent with an alternate narrative of reasonable, lawful business decision-making.  *See Integra Med Analytics*, 816 F. App'x at 897 ("A claim is merely conceivable and not plausible if the facts pleaded are consistent with both the claimed misconduct and a legal and obvious alternative explanation."); *Catholic Health Initiatives*, 312 F. Supp. 3d at 597 (drawing a distinction "between the improper intent to induce referrals prohibited by the AKS and an honest, if business-minded, desire to maintain good customer relationships").

In sum, the Complaint fails to properly plead an AKS-predicate violation because it fails to allege how it was that the Bank provided remuneration, the form of that remuneration, why the Bank believed that remuneration would induce referrals for  DHR, and how the Bank benefited in any way from such remuneration.  *Ruscher*, 2014 WL 2618158, at *10.

   c.   **Relators have not sufficiently pleaded the existence of a <u>single false claim</u> that resulted from the supposedly-induced referrals.**

Relators also fail to plead the actual submission of a false claim as a result of the allegedly-induced referrals.  This is an essential component of Relators' FCA claim which is completely lacking in their Complaint.  *See Catholic Health Initiatives*, 312 F. Supp. 3d at 598–99; *United States ex rel. King v. Alcon Labs., Inc.*, 232 F.R.D. 568, 572 (N.D. Tex. 2005) (dismissing complaint where relator failed to "specifically identify any fraudulent claims for payment that were submitted by the defendants to the government.").  To satisfy Rule 9(b), the Complaint must either

allege "the details of an actually submitted false claim," or alternatively, and *at a bare minimum*, allege the "particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted.'" *Catholic Health Initiatives*, 312 F. Supp. 3d at 598–99 (quoting *Grubbs*, 565 F.3d at 190) (dismissing AKS-based FCA claims, noting that "[i]n the absence of such details, the failure to identity an actually submitted false claim is fatal to Relators' claims").

No "particular details" or "reliable indicia" are to be found in Relators' allegations.  The Complaint does not set forth any facts concerning: (a) the date of the referral, (b) the referred patient's name or other identifying information, (c) the name of the referring physician, (d) the medical treatment provided at DHR, (e) the date DHR submitted a claim for that treatment, (f) the federal healthcare program to which DHR submitted the claim, (g) the date and amount of payment that DHR received, and, crucially, (h) facts connecting the claim to an LSNB loan, such as whether the referring physician had an LSNB loan.

The Complaint's nine paragraphs of factual allegations as to the Bank boil down to sheer speculation that the Bank *must have* been giving DHR physicians loans to incentivize referrals, and DHR *must have* submitted claims to federal healthcare programs based on those referrals.  This fails 9(b).  *See, e.g.*, *Hebert*, 295 F. App'x at 722 (holding that relators failed to satisfy 9(b) where they made only "broad claims against numerous defendants without identifying specific actions of specific individuals at specific times that would constitute fraud against the government."); *United States ex rel. Nunnally v. W. Calcasieu Cameron Hosp.*, 519 F. App'x 890, 894 (5th Cir. 2013) (dismissing relator's claims which "fail[ed] to allege any particular details of any actual referral by a physician" to the defendant-hospital); *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 903 (5th Cir. 1997) (affirming dismissal of relator's complaint

where relator "did not identify any specific physicians who referred patients for medically unnecessary services or any specific claims for medically unnecessary services that were submitted by defendants"); *King*, 232 F.R.D. at 572 (finding that relators failed to plead fraud with particularity because they did not identify a single person involved in the alleged fraud, did not point to specific fraudulent claims, and did not specify a single date on which fraudulent activity occurred). Because the allegations in the Complaint add up to no more than Relators' unadorned say-so that the Bank violated the AKS and caused the submission of false claims, Relators' FCA claim against the Bank fails.

### 2. Relators have not pleaded a cognizable claim for a Stark Law violation.

Relators' FCA claim against the Bank is also predicated on a violation of the Stark Law's "bona fide investment requirement," which prohibits, among other things, a ***hospital*** (or any ***owner*** or ***investor*** in the ***hospital***) from directly or indirectly providing loans or financing for investment in the hospital by a physician owner or investor. 42 U.S.C. § 1395nn(i)(1)(D)(iii)–(iv). Relators' allegations fail to show a Stark Law violation, and thus, like the AKS-based claim, fail to satisfy the first element of Relators' FCA claim (a false statement or fraudulent course of conduct).

### a. The Stark Law does not apply to the Bank as a matter of law.

Relators' Stark-predicated claims are foreclosed as a matter of law because the Stark Law *does not apply to the Bank*. Stark prohibits a ***physician*** from making referrals to a hospital with which the physician has a financial relationship and, likewise, prohibits a ***hospital*** from submitting a claim to a federal healthcare program pursuant to a referral from a physician with whom it has a financial relationship. *Id.* § 1395nn(a)(1)(A)–(B). *The Bank is not a hospital*. It does not refer patients to hospitals or other healthcare entities and cannot submit claims to government healthcare programs. Thus, the Bank, as a matter of law, cannot violate Stark. Relators offer no legal

authority that supports imposing FCA liability on a bank predicated on a Stark violation by a physician or hospital.

> **b.      Relators cannot plead around the fact that the Stark Law does not apply to the Bank with insufficient allegations that the Bank "caused" a Stark Law violation.**

Undeterred by the plain language of the statute, Relators attempt to manufacture Stark liability against the Bank through a tortured theory premised on DHR "indirectly" offering loans to physician investors through the Bank.  Dkt. 82, ¶¶ 44, 218, 279.  Other than parroting the language of Stark's prohibition against "indirect loans" to physicians from hospitals, the Complaint does not contain a single fact supporting the allegation that DHR was involved in the Bank's lending.  The Stark Law imposes no liability on the Bank for issuing loans.  But even if the Bank could be liable for a Stark Law violation, Relators have not pleaded their claim with particularity under Rule 9(b).  The Complaint fails to describe how DHR or any other defendant "indirectly" made loans to the Bank's customers, and Relators have failed to identify a single referral made by a single physician who received a Bank loan, or a single claim submitted to federal health programs that violates Stark as a result of a Bank loan.  *See supra*, pp. 12–14.

> **3.      Relators do not plausibly allege that the Bank violated the False Claims Act.**

Relators fail to plausibly allege AKS and Stark-predicate violations, thus Relators have failed to plead the first element of their FCA claim (a false statement or fraudulent course of conduct), and their FCA claims should be dismissed.  Relators' FCA claim additionally fails because the Complaint has not plausibly alleged the remaining elements of Relators' FCA claim: that the Bank knowingly caused the submission of false claims material to the Government's payment decisions.  *See Parikh*, 977 F. Supp. 2d at 662.

### a. Relators fail to sufficiently plead that the Bank "knowingly" caused the submission of false claims.

First, Relators must plead facts sufficient to claim that the Bank acted "knowingly." *See* 31 U.S.C. § 3729(a)(1)(A)–(B). The FCA defines "knowingly" to mean that a person "(i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information." *Id.* § 3729(b)(1)(A)–(B). Although knowledge need only be alleged "generally," *Ruscher*, 2014 WL 2618158, at *5, Relators plead <u>no</u> allegations concerning the Bank's scienter.

### b. Relators fail to sufficiently plead that the Bank *caused* the submission of false claims.

As previously stated, *supra*, pp. 12–14, Relators have failed to allege the "particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted." *Catholic Health Initiatives*, 312 F. Supp. 3d at 598–99. Relators' FCA claims thus fail. But even if Relators had sufficiently pleaded that false claims were submitted to the federal government, the Complaint still does not plausibly allege that the Bank *caused* the submission of those false claims.

There are no allegations that the Bank reasonably could anticipate that providing a loan to a physician would result in the submission of false claims for healthcare services to the federal government, or that the loans were a substantial factor in inducing a physician to submit *any* claim, let alone a false claim. *See United States v. Abbott Labs.*, 2016 WL 80000, at *6 (N.D. Tex. Jan. 7, 2016) ("Defendants' conduct may be found to have caused [the FCA violation] if the conduct was (1) a substantial factor in inducing providers to submit claims . . . and (2) if the submission of claims . . . was reasonably foreseeable or anticipated as a natural consequence of Defendants' conduct."). In short, Relators have failed to allege "a sufficient nexus between the conduct of the

[Bank] and the ultimate presentation of the false claim." *United States ex rel. Wuestenhoefer v. Jefferson*, 105 F. Supp. 3d 641, 681 (N.D. Miss. 2015).

### c. Relators fail to sufficiently plead that any false claim was "material" to the Government's payment decisions.

Relators' Complaint is devoid of allegations of an essential element of their FCA claim: materiality. Significantly, there is *no* allegation that the Government declined to pay any DHR claim submitted over the past ten years since Relators' Original Complaint was filed. A finding of materiality is defeated by the Government's continued payment of claims. *United States ex rel. Lemon v. Nurses To Go, Inc.*, 924 F.3d 155, 162 (5th Cir. 2019) (explaining that when government pays a claim despite knowledge that certain requirements were violated, that is "very strong evidence that those requirements are not material").

### d. Relators' Stark-predicated FCA claims are time-barred.

Dismissal of Relators' Stark-predicated FCA claims is also required because they are time-barred. Relators' Original Complaint was filed on July 12, 2011. But the Affordable Care Act amendments to the Stark Law that incorporated the "bona fide investment" requirement were not effective until September 23, 2011. Relators' Amended Complaint focuses on loans that were "outstanding" as of September 23, 2011 because that was the first date that the Bank's loans could possibly be cast as Stark violations under the "bona fide investment" requirement. These claims do not relate back to the Original Complaint because they are premised on a change in the law which occurred *after* Relators filed their Original Complaint. Put differently, the conduct Relators now claim is unlawful was *not* unlawful at the time they filed their Original Complaint. *United States ex rel. Vavra v. Kellogg Brown & Root, Inc.*, 848 F.3d 366, 382 (5th Cir. 2017) ("[A] new claim or pleading will not relate back when it asserts a new ground for relief supported by facts that *differ in both time and type* from those the original pleading set forth."). Thus, Relators' Stark-

predicated FCA claims must fail as a matter of law. Relators fail to plead a plausible claim for relief under the False Claims Act, and Counts I–III[7] should be dismissed.[8]

## B. Relators Fail to Plead with Particularity Elements of a Conspiracy to Violate the FCA

Relators also must plead with particularity the elements of an FCA conspiracy: "(1) the existence of an unlawful agreement between defendants to get a false or fraudulent claim allowed or paid by the government; and (2) at least one act performed in furtherance of that agreement." *United States ex rel. Dekort v. Integrated Coast Guard Sys.*, 705 F. Supp. 2d 519, 548 (N.D. Tex. 2010) (citing *United States ex rel. Farmer v. City of Houston*, 523 F. 3d 333, 343 (5th Cir. 2008); *see also Grubbs*, 565 F.3d at 193 ("The particularity requirements of Rule 9(b) apply to the False Claims Act's conspiracy provision."). In one sentence, Relators allege a conspiracy involving the Bank. Relators claim the Bank conspired with DHR "through a scheme whereby [DHR] and some of its physician investors directly or indirectly provided loans to DHR physician investors to invest in DHR." Dkt. 82, ¶ 279. Relators do not plead that the Bank entered into an agreement with DHR to provide improper loans, and they fail to allege even one act in furtherance of that agreement. Additionally, because Relators' conspiracy claim is predicated on the same flawed theory as their

---

[7] The Complaint fails to specify which causes of action apply to the Bank. Out of an abundance of caution and for purposes of this Motion only, the Bank assumes that Relators have asserted Counts I–III and V against the Bank. (Count IV is an FCA retaliation claim that is inapplicable to the Bank).

[8] Relators' claims under the state-law analogue of the FCA, the TMFPA, fail for the same reasons that Relators' FCA claims fail, as Relators concede they have alleged no different or additional facts in support of their TMFPA claim. Dkt. 82 ¶ 331. *See Catholic Health Initiatives*, 312 F. Supp. 3d at 606 ("Federal courts analyzing TMFPA claims alongside FCA claims have pinned their analysis of the former to their analysis of the latter."). This Court should dismiss Count V. Alternatively, if the Court dismisses Counts I–III, the Court should dismiss Count V because it will no longer have supplemental jurisdiction over that state law claim. *See id*. at 606–07 (after dismissing FCA claims, electing to dismiss TMFPA claim for lack of supplemental jurisdiction).

predicate FCA claim against the Bank, it is also fatally flawed and must be dismissed. *United States ex rel. King v. Solvay S.A.*, 823 F. Supp. 2d 472, 516 (S.D. Tex. 2011), *vacated on other grounds*, 2012 WL 1067228 (S.D. Tex. Mar. 28, 2012) (dismissing conspiracy claim under Rules 9(b) and 12(b)(6) where underlying claims upon which conspiracy was based were also dismissed under Rules 9(b) and 12(b)(6)).

### C.    The FCA's Public-Disclosure Bar Precludes This Action

The FCA's public disclosure bar "preclude[s] qui tam suits based on information that would have been equally available to strangers to the fraud transaction had they chosen to look for it as it was to the relator." *Wercinski v. Int'l Bus. Machines Corp.*, 982 F. Supp. 449, 458 (S.D. Tex. 1997). Congress enacted the bar to accomplish one of the primary goals of the FCA, "preventing parasitic suits by opportunistic late-comers who add nothing to the exposure of fraud." *United States ex rel. Reagan v. E. Tex. Med. Ctr. Reg'l Healthcare Sys.*, 384 F.3d 168, 174 (5th Cir. 2004).

Effective July 22, 2010, the FCA's public disclosure bar was amended.  The pre-July 2010 version of the public disclosure bar provided that—

> (4)(A) ***No court shall have jurisdiction*** over an action under this section ***based upon*** the ***public disclosure of allegations or transactions*** in a criminal, civil, or administrative hearing, in a congressional, ***administrative***, or Government Accounting Office ***report***, hearing, audit, or investigation, or ***from the news media***, unless the action is brought by the Attorney General or the person bringing the action is an ***original source*** of information.

31 U.S.C. § 3730(e)(4)(A), amended by 31 U.S.C. § 3730(e)(4)(A) (Supp. 2011).  The amended version of the public disclosure bar now provides that—

> (4)(A) ***The court shall dismiss*** an action or claim under this section, unless opposed by the Government, if ***substantially the same allegations or transactions*** as alleged in the action or claim were ***publicly disclosed*** (i) in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party; (ii) in a congressional Government Accountability Office, ***or other Federal Report***, hearing, audit, or investigation; or (iii) ***from the news media***, unless the action is

19

brought by the Attorney General or the person bringing the action is an ***original source*** of the information.

31 U.S.C. § 3730(e)(4)(A).   This changed language, however, "has no real impact, as courts considering the term 'based upon' interpret[] it to mean 'substantially the same.'"   *United States ex rel. Hendrickson v. Bank of Am., N.A.*, 343 F. Supp. 3d 610, 623 (N.D. Tex. 2018), *aff'd*, 779 F. App'x 250 (5th Cir. 2019).   Ultimately, the fundamental issue remains the same: "whether the scope of Relator[s'] action is similar to the allegations or transactions that are publicly disclosed." *Green*, 2017 WL 1209909, at *8.

Relators do not identify the dates of any loans. Instead, they plead generically that the Bank provided loans "[b]eginning in 2010" before pivoting to focus on loans that were "created or remained outstanding after September 23, 2011." Dkt. 82, ¶ 44.   Because Relators appear to allege both pre- and post-July 2010 conduct, both versions of the statute are discussed herein.   Under either version, the public disclosure bar precludes Relators' claims.

In determining whether the public disclosure bar precludes a claim, courts consider: "(1) whether there has been a 'public disclosure' of allegations or transactions, (2) whether the qui tam action is 'based upon' such publicly disclosed allegations, and (3) if so, whether the relator is the 'original source' of the information." *Jamison*, 649 F.3d at 327 (evaluating the pre-July 2010 version); *Green*, 2017 WL 1209909, at *5 (applying the same three-part test to the amended version).

> **1.     The key transactions underlying Relators' claims against the Bank were publicly disclosed in "administrative reports," "Federal Reports," and "from the news media" before Relators filed their Amended Complaint.**

Although neither version of the public disclosure defines "allegations" or "transactions," courts have construed "allegation to refer to a *direct claim of fraud*, and transaction to refer to *facts from which fraud can be inferred*." *United States ex rel. Mateski v. Raytheon Co.*, 816 F.3d 565,

571 (9th Cir. 2016); *see, e.g.*, *United States ex rel. Springfield Terminal Ry. Co. v. Quinn*, 14 F.3d 645, 653–54 (D.C. Cir. 1994) (defining "allegation" as a direct claim of fraud and "transaction" as a combination of facts "from which readers or listeners may infer" fraud).  Importantly, the Fifth Circuit has made clear that "[a]n FCA qui tam action *even partly based upon public allegations or transactions* is nonetheless 'based upon' such allegations or transactions." *Reagan*, 384 F.3d at 176.  Relators allege <u>three key transactions</u> from which they infer the Bank, a *financial institution*, committed healthcare fraud: (1) LSNB loans were provided to physicians to invest in DHR, (2) certain loans remained outstanding after September 23, 2011, and (3) Cantu "controls" both DHR and LSNB by nature of his ownership interests in each entity.  Dkt. 82, ¶¶ 44, 214–220. The Bank's loans to some DHR physicians and Cantu's ownership stake in DHR and LSNB were publicly disclosed in administrative reports, Federal reports, and from the news media long before Relators filed their Original Complaint on July 12, 2011, thereby implicating the public disclosure bar.[9]

To trigger the public disclosure bar, there must be a "public disclosure" through one or more sources enumerated in § 3730(e)(4)(A).  Relevant here, under the pre-July 2010 version, qualifying sources include, "news media" and "administrative reports"; under the post-July 2010 version, qualifying sources include "news media" and "Federal reports." Although administrative and Federal reports are not defined in the statute, the Supreme Court defines "report" broadly as "something that gives information" or a "notification." *Schindler Elevator Corp. v. United States*

---

[9] That loans remained outstanding as of September 23, 2011 (the date on which the ACA was amended and the earliest date the Bank's loans could allegedly violate the Stark Law) necessarily was not disclosed prior to Relators filing their Original Complaint on *July 12, 2011*.  As explained on pp. 17, *supra*, the claims in Relators' Amended Complaint do not relate back to the Original Complaint because they are premised on a change in the law which occurred *after* Relators filed their Original Complaint on July 12, 2011.

*ex rel. Kirk*, 563 U.S. 401, 407 (2011) ("This broad ordinary meaning of 'report' is consistent with the generally broad scope of the FCA's public disclosure bar.").  In *United States ex rel. Reagan v. E. Tex. Med. Ctr. Reg'l Healthcare Sys.*, the Fifth Circuit held that agency responses to a FOIA request constituted "administrative reports" because information was made public through official government (i.e., administrative) action.  384 F.3d at 176.  *See also United States ex rel. Maur v. Hage-Korban*, 981 F.3d 516, 522 (6th Cir. 2020) (cardiologist's integrity agreement with the U.S. Department of Health and Human Services Office of Inspector General, made publicly available on the Inspector General's website, was a "Federal Report" that triggered the public disclosure bar).  Importantly, in the Fifth Circuit, courts focus "not on *who* created the information, but on the fact that the information [was] made public through official government action." *United States ex rel. Colquitt v. Abbott Labs*, 864 F. Supp. 2d 499, 518 (N.D. Tex. 2012); *Reagan*, 384 F.3d at 176).  The court in *United States ex rel. Colquitt v. Abbott Labs* similarly held that information provided to the FDA by medical device manufacturers and other third parties were "reports" that triggered the public disclosure bar because the FDA subsequently released this information to the public. 864 F. Supp. 2d at 518.

Like "report," the phrase "news media" has a broad sweep.  *Graham Cnty. Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 559 U.S. 280, 290 (2010).  "Courts have unanimously interpreted the term 'public disclosure' to include websites and online articles." *Green*, 2017 WL 1209909, at *6.

> a.  **Cantu's ownership interest in DHR and LSNB was publicly disclosed in annual reports submitted to federal agencies and in online articles.**

Cantu's ownership interests in DHR and LSNB have always been publicly disclosed.  For example, Bancshares' "Annual Report of Bank Holding Companies" filed with the Board of Governors of the Federal Reserve System *in 2010* identifies Cantu as a "Director & Chairman of

the Board" with 36.78% "of voting shares in Bank Holding Company" and 7.08% of "Day Surgery at Renaissance, LLC," the predecessor company of DHR.  Dkt. 82, ¶ 29.  **Exhibit 1.**[10]  This annual report (and every annual report filed thereafter) is available for download at the Federal Reserve's website (https://www.dallasfed.org/).  Because these reports "give information" and were made publicly available by the government, they constitute both "administrative reports" that trigger the pre-2010 jurisdictional public disclosure bar and "Federal Reports" that trigger the post-2010 public disclosure bar.  *See Colquitt*, 864 F. Supp. 2d at 518; *Reagan*, 384 F.3d at 176.

Cantu's ownership stakes in DHR and LSNB has been publicly disclosed in numerous online articles as well.  Relators themselves admit that their knowledge of Cantu's ownership interest in the Bank stems from "Lone Star National Bank's annual reports and website."  Dkt. 82, ¶ 216.  Years before Relators filed their Original Complaint on July 12, 2011, a July 2009 article in The New York Times described Cantu as a DHR "founder, investor and board member." **Exhibit 2**.[11]  Also in 2009, Texas Monthly similarly described Cantu as "a key investor in the

---

[10] Per Federal Rule of Evidence 201, the Bank requests that the Court take judicial notice of the government records made exhibits to this motion as "fact[s] that [are] not subject to reasonable dispute because [they]: (1) [are] generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  FED. R. EVID. 201(b); *Basic Capital Mgmt., Inc. v. Dynex Capital, Inc.*, 976 F.3d 585, 589 (5th Cir. 2020) (recognizing that publicly available governmental filings, the existence of the filings, and their contents cannot reasonably be questioned and therefore fall within the ambit of Rule 201); *Funk v. Stryker Corp.*, 631 F.3d 777, 783 (5th Cir. 2011) (recognizing that judicially noticed facts may be considered in ruling on a 12(b)(6) motion).

[11] The Bank requests that the Court similarly take judicial notice that the articles made exhibits to this motion were made publicly available online and contained factual allegations about Cantu's relationship to the Bank and DHR.  FED. R. EVID. 201(b).  The Bank does not ask the Court to take judicial notice of the truth of the matters asserted therein.  *Simms v. Jones*, 2011 WL 5978594, at *2 (N.D. Tex. Nov. 30, 2011) (stating that the court "takes judicial notice of the articles for the limited purpose of showing what facts were disclosed to the public and will not otherwise consider them"); *United States ex rel. Lam v. Tenet Healthcare Corp.*, 481 F. Supp. 2d 673, 680 (W.D. Tex. 2006) ("Courts have the power to take judicial notice of the coverage and existence of newspaper

hospital," **Exhibit 3**, and as "a prominent McAllen developer and an investor in DHR," **Exhibit 4**. Later articles published before Relators filed their Amended Complaint described Cantu as going from "building homes and shopping centers to *owning* a title company, *a bank*, a soccer team, a basketball team, and *a significant stake in a doctor-owned hospital in Edinburg*."   **Exhibit 5** (emphasis added).   Relators' claims that "Doctors Hospital and Lone Star National Bank have common ownership" and that "Cantu in fact controls both entities" have long been asserted by the news media. Dkt. 82, ¶ 220.   Indeed, Relators' allegations are strikingly similar in scope to those made in a *May 2009* article published by The New Yorker.   **Exhibit 6.**   The article described DHR as "physician-owned" and claimed it had a "reputation" for "aggressively recruiting high-volume physicians to become *investors* and send patients [to DHR]."   The article further claimed that—

> Physicians who [refer patients] receive not only their fee for whatever service they provide but also a percentage of the hospital's profits from the tests, surgery, or other care patients are given.

Exhibit 6 at 4.   These articles constitute "news media," and because Relators' claims are based upon these publicly available transactions, they are precluded by the public disclosure bar.

Relatedly, Relators' claim that "Alonzo Cantu, S. David Deanda, and Dr. Victor Haddad had the power to exercise a controlling influence over the management or policies of the bank," *id.* ¶ 218, was similarly publicly disclosed before Relators filed their lawsuit insofar as LSNB publicly advertised its board members and advisory directors on its company website in 2011 (and continues to do so to this day), **Exhibit 7**, and it is hardly a secret that directors have "controlling influence" over the entities they serve.   Relators' claims are therefore barred.

---

and magazine articles," as well as "the fact that the market is aware of information contained in news articles . . . .").

> **b.    Information regarding loans made to physicians for the purpose of investing in DHR is publicly available on the Texas Secretary of State's website.**

That LSNB loans were provided to physicians for the purpose of investing in DHR has also been publicly disclosed by "administrative reports." Specifically, LSNB files required UCC-1 forms with the Texas Secretary of State in order to perfect its security interest in collateral for the loans, and the Texas Secretary of State makes these forms publicly available on its website. Each UCC-1 form identifies the physician (debtor/borrower) and contains a description of the collateral as DHR partnership interests. *See* **Exhibit 8**. Importantly, Relators do not identify which loans remained outstanding as of September 23, 2011. Relators do not identify any loans, period. Instead, Relators know that the ACA was amended on September 23, 2011—another publicly known fact—and expect the Court to *assume (again)*, without any supporting allegations, that certain loans *must have* remained outstanding after that date. Relators' claims are hardly the result of direct knowledge or independent investigative efforts. Rather, Relators' allegations are closely related in scope to the information contained in the UCC-1 forms, together with the May 2009 article in The New Yorker which accused DHR of "aggressively recruiting high-volume physicians to become *investors*." Exhibits 6 and 8. A chart attached as **Exhibit 9** identifies the three key transactions asserted by Relators and how each transaction is related in scope to publicly disclosed information.

The only claims against the Bank that are not arguably related in scope to publicly disclosed information are that DHR physicians received additional "compensation" in violation of the AKS in the form of below-market rent on medical offices, and loans at below-market rates to build medical offices and "mansion-sized houses." Dkt. 82, ¶¶ 218, 221. However, the Fifth Circuit has made clear that "[a]n FCA qui tam action *even partly based upon public allegations or transactions* is nonetheless 'based upon' such allegations or transactions." *Reagan*, 384 F.3d at

176.  Because Relators' claims against the Bank are premised on three central transactions—including that loans were provided to physicians and that Cantu purportedly controls both entities—and these three transactions have been publicly disclosed in administrative and Federal reports or from major news media, Relators' claims are barred under both versions of the public disclosure bar.  *Jamison*, 649 F.3d at 327 ("[F]or the public-disclosure bar to apply, the publicly disclosed allegations or transactions need only be as broad and as detailed as those in the relators' complaint . . . .").

## 2.    Relators are not the original source of this information.

Because the allegations in the Complaint are based upon or substantially the same as publicly disclosed transactions, Relators' Complaint can only survive if Relators are the "original source." 31 U.S.C. § 3730 (e)(4)(B).  They are not and therefore the Complaint must be dismissed on these grounds alone.  Although the definition of an "original source" was amended in July 2010, Relators do not qualify under either version of the statute.  To be an original source for pre-July 2010 conduct, Relators must have "*direct and independent knowledge* of the information on which the allegations are based," and must have "voluntarily provided the information to the Government before filing the qui tam action." 31 U.S.C. § 3730(e)(4)(B), *amended by* 31 U.S.C. § 3730(e)(4)(B) (Supp. 2011).  Relators cannot meet this standard.  By Relators' own admissions, their allegations are based on information they reviewed in LSNB's publicly available "annual reports and website." Dkt. 82, ¶ 216.  *United States. ex rel. Schumann v. Astrazeneca Pharm. L.P.*, 769 F.3d 837, 846 (3d Cir. 2014) ("[A] relator cannot be said to have direct and independent knowledge of the information on which [its fraud] allegations are based, if the relator has no direct and independent knowledge of the allegedly fraudulent statements.").  Relators certainly cannot claim to be the original source of who owns what percentage of DHR partnership interests or Bank shares, or of the fact that loans were provided to physicians.  Relators, who were registered nurses

employed by DHR during the relevant time period, also do not claim to have a unique insight into the Bank's lending practices by virtue of their job responsibilities at DHR, or that their training/positions allowed them to identify that the Bank was committing healthcare fraud where others could not see it.  Moreover, "the Fifth Circuit does not impute 'direct and independent knowledge' to relators for simply contributing their own exploratory efforts and experience to develop allegations of fraud."  *Green*, 2017 WL 1209909, at *7; *see also A-1 Ambulance Serv., Inc. v. California*, 202 F.3d 1238, 1245 (9th Cir. 2000) ("A relator's ability to recognize the legal consequences of a publicly disclosed fraudulent transaction does not alter the fact that the material elements of the violation already have been publicly disclosed.").  Thus, Relators are not original sources of the information upon which their claims against the Bank are based.  The public disclosure bar therefore applies, and the Court lacks jurisdiction to hear Relators' claims concerning any loans that were made before July 22, 2010.

Relators do not qualify as "original sources" under the post-July 2010 public disclosure bar either.  To be an original source under the amended statute, a relator must either (1) have voluntarily disclosed to the Government the information on which her allegations or transactions are based *prior* to the public disclosure, or (2) have knowledge that is *independent of and materially adds* to the publicly disclosed allegations or transactions and that was provided to the government before the filing of an action.  31 U.S.C.A. § 3730(e)(4)(B).

The facts that Cantu has an ownership stake in both DHR and LSNB, and that LSNB loans were provided to physicians to invest in DHR were publicly disclosed at least as early as 2009— long before Relators filed their Complaint.  Relators therefore cannot be "original sources" under the first prong of the amended public disclosure bar.  The relevant inquiry, then, is whether Relators have "knowledge that is independent of and *materially adds* to the publicly disclosed

allegations or transactions," and provided this information to the government before filing their complaint. *Id.*

Relators do not meet this standard. Relators' allegations against the Bank span a mere nine of the Complaint's 332 paragraphs. Dkt. 82, ¶¶ 214–221, 226. In the first four of these paragraphs, Relators detail when Cantu founded DHR and LSNB and claim that Cantu, Deanda, and Haddad have "substantial ownership and voting interests" in the Bank.[12] *Id.* ¶¶ 214–217. This information constitutes "background information and details" that do not materially add to the publicly disclosed transactions. *See, e.g., United States ex rel. Winkelman v. CVS Caremark Corp.*, 827 F.3d 201, 213 (1st Cir. 2016) ("[A] relator who merely adds detail or color to previously disclosed elements of an alleged scheme is not materially adding to the public disclosures."); *United States v. Garman*, 719 F. App'x 459, 463 (6th Cir. 2017) (same); *United States ex rel. Osheroff v. Humana Inc.*, 776 F.3d 805, 815 (11th Cir. 2015) (same). The next three paragraphs, ¶¶ 218–220, contain the three key transactions from which Relators infer fraud, all of which are substantially similar to publicly disclosed information. Relators add nothing "distinct from what has already been publicly disclosed," nor do they "add[] in a significant way to the essential factual background: the who, what, when, where and how of the events at issue." *United States ex rel. Moore & Co., P.A. v. Majestic Blue Fisheries, LLC*, 812 F.3d 294, 307 (3d Cir. 2016). In short, all the essential elements of the Bank's alleged healthcare fraud were already publicly disclosed; there is nothing for Relators to materially add. *Green*, 2017 WL 1209909, at *9.

---

[12] Deanda's and Haddad's ownership and voting interests in the Bank can be inferred from their board membership, which has been publicly available since before Relators' filed their Original Complaint in July 2011. **Exhibit 10.**

Relators are not original sources of the information upon which their claims against the Bank are based. The public disclosure bar therefore applies, and the Court must dismiss Relators' claims concerning any loans that were made after July 22, 2010.

## VII.   CONCLUSION

For the foregoing reasons, the Court should grant Defendants Lone Star National Bank and Lone Star National Bancshares-Texas, Inc.'s Motion to Dismiss with prejudice. Relators have failed to state a plausible claim for relief as required under *Twombly* or plead with particularity as required by Rule 9(b). Relators' claims are also barred under both the pre- and post-July 2010 versions of the "public disclosure bar." Moreover, after ten years and one amendment, further amendment of the Complaint would be futile. If Relators had more details to allege, they would have (and should have) done so by now. And no amount of repleading can cure the fact that Relators' allegations involving the Bank are substantially the same information that was publicly disclosed before they filed this action. Dismissal with prejudice under Rules 12(b)(6), 9(b), and 12(b)(1) is appropriate. *See, e.g.*, *Rio Grande Royalty Co. v. Energy Transfer Partners, L.P.*, 620 F.3d 465, 468 (5th Cir. 2010) ("The trial court acts within its discretion in denying leave to amend where the proposed amendment would be futile because it could not survive a motion to dismiss.").

Dated:  May 20, 2021

Respectfully Submitted,

**SMYSER KAPLAN & VESELKA, L.L.P.**

*/s/ Lee L. Kaplan*
Lee L. Kaplan
State Bar No. 11094400 (Fed. Bar No. 1840)
*Attorney-in-Charge*
Karima G. Maloney (Fed. Bar No. 649984)
State Bar No. 24041383
Samantha Jarvis (Fed Bar No. 2774222)
State Bar No. 24089238
Jacquelyn R. Rex (Fed. Bar No. 3160021)
State Bar No. 24098317
717 Texas Avenue, Suite 2800
Houston, Texas 77002
(713) 221-2300 (phone)
(713) 221-2320 (fax)
lkaplan@skv.com
kmaloney@skv.com
sjarvis@skv.com
jrex@skv.com

**Walsh McGurk Cordova Nixon**
Weldon G. "Beau" Nixon, Jr.
State Bar No. 24047278
Michael A. McGurk
State Bar No. 00797746
1506 S. Lone Star Way, Ste. 10
(956) 632-5000 (phone)
(956) 632-55050 (fax)
bnixon@wmcnlaw.com
mmcgurk@wmcnlaw.com

**ATTORNEYS FOR DEFENDANTS LONE STAR NATIONAL BANK, LONE STAR NATIONAL BANCSHARES-TEXAS, INC., AND DR. VICTOR HADDAD**

## CERTIFICATE OF SERVICE

I hereby certify that, on May 20, 2021, I filed the foregoing with the Clerk of the Court using the CM/ECF system, which will provide electronic notice to all counsel of record.

*/s/ Lee L. Kaplan*
Lee L. Kaplan

30