Case 4:11-cv-02565   Document 164   Filed on 07/27/22 in TXSD   Page 1 of 18

United States District Court
Southern District of Texas
**ENTERED**
July 28, 2022
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| DONNA MENDEZ, *et al.*, § | |
| § | |
| Plaintiffs, § | |
| § | |
| VS. § | CIVIL ACTION NO. 4:11-CV-02565 |
| § | |
| DOCTORS HOSPITAL AT § | |
| RENAISSANCE, LTD., *et al.*, § | |
| § | |
| Defendants. § | |

## MEMORANDUM OPINION AND ORDER

**I.   INTRODUCTION**

Pending before the Court is the defendants', Doctors Hospital at Renaissance, Ltd. ("DHR") and RGV MED LLC ("RGV MED") (together, the "DHR Defendants"), motion to dismiss the relator-plaintiffs' Second Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) (Dkt. No. 145).  The relator-plaintiffs, or the relators, Donna Mendez and Selina Rushing, have filed a response to the defendant's motion (Dkt. No. 160), and the DHR Defendants have filed a reply (Dkt. No. 162).  Additionally, the United States of America has filed a Notice of Supplemental Authority related to the DHR Defendants' motion (Dkt. No. 161).

After reviewing the relators' Second Amended Complaint, the motion, the response and reply, and the applicable law, the Court determines that the DHR Defendants' motion should be **GRANTED IN PART** and **DENIED IN PART**.

1 / 18

## II.    FACTUAL AND PROCEDURAL BACKGROUND

Since 2003, through their respective limited partner affiliates, the DHR Defendants have operated numerous medical facilities in south Texas. DHR employed relator Donna Mendez as a case manager from April 2009 to September 2011. Mendez worked in DHR's Catheterization Lab (the "Cath Lab") from April to August 2009 and in the pediatric unit from August 2009 until at least July 2011. Relator Selina Rushing also worked for DHR from May 14, 2007 to May 25, 2011, when she was terminated. She worked as a clinical nurse in the labor and delivery ward at the Women's Hospital until February 2009, when she transferred to the Cath Lab as a case manager. Rushing returned to the labor and delivery ward as a case manager in June 2009 and remained there until April 2011.

The relators allege that during their tenure at various DHR facilities, they observed fraudulent billing, admissions, and discharge practices that resulted in DHR's submissions of false reimbursement claims to federal and state healthcare programs. They also contend that the DHR Defendants unlawfully provided loans and other illegal remuneration to their contracting physicians that resulted in violations of the federal False Claims Act ("FCA")[1] and Texas Medicaid Fraud Prevention Act ("TMFPA").[2] The SAC, which runs 100 pages long, alleges the same four categories of unlawful schemes as the First Amended Complaint ("FAC"). The Court will indicate herein any new allegations have been added to the SAC.

---

[1] *See* 31 U.S.C. § 3729, *et seq.*

[2] *See* Tex. Hum. Res. Code Ann. §§ 36.001, *et seq.*

### a. The Medical Necessity Theory

The relators first allege that they observed or learned of a high rate of unnecessary admissions and treatments in numerous DHR facilities (the "Medical Necessity" theory).

#### i. *Allegations Concerning the Cath Lab*

Since at least 2007, 60% of patient files in the DHR's Cath Lab allegedly "lacked medical necessity standards," and 86% of patients receiving Cath Lab procedures should have been discharged the same day they were admitted, but were not. Additionally, between May 2008 and May 2011, two-thirds of the echocardiograms performed in the Cath Lab were allegedly unnecessary. The SAC adds that Mendez allegedly reported two unnecessary echocardiograms performed on Medicare patients in June and August 2009 by separate physicians, Dr. Subbarao Yarra and Dr. Hector Soto. Mendez allegedly reported the June 2009 incident to her supervisor, Karen McAlister, and DHR's in-house counsel, Jim Darling. She allegedly reported the August 2009 incident to DHR's chief nursing officer, Sue Bajus. According to the SAC, Mendez also informed McAlister that, on May 25, 2011, Dr. Carlos Ramirez had ordered medically unnecessary consultations for a Medicare patient. In each case, no corrective action was taken. The relators also allege that Cath Lab physicians regularly qualified patients for medically unnecessary cardiac defibrillators and pacemakers.

#### ii. *Allegations Concerning other DHR Facilities*

The relators allege routine unnecessary admissions in various other DHR facilities, as well. During her assignment to the pediatric unit, relator Mendez allegedly observed

that the unit unnecessarily hospitalized children for a respiratory virus and obtained unnecessary pre-authorization for emergency flights to Driscoll's Children's Hospital in Corpus Christi. Physicians in the Women's Hospital's labor and delivery ward "commonly" induced premature labor unnecessarily and admitted pregnant women under false diagnoses (or "DRGs"),[3] such as hypertension. In the SAC, Rushing cites one instance, on November 11, 2010, in which she notified numerous DHR employees and officers regarding a Medicare patient whose admission to the Women's Hospital that day for diabetes during pregnancy was medically unnecessary.

The relators further allege, generally, that physicians at DHR's Behavioral Hospital falsely diagnosed patients with psychiatric conditions in order to have them committed to the hospital, later billing government healthcare programs for counseling services that were not provided. Here, the SAC describes one instance in which a Medicare patient was kept at the Behavioral Hospital from January 30, 2010 to July 5, 2010, despite being cleared for discharge by a psychiatrist.

### iii.   *Prescriptions of Hypertension Drug*

The SAC also alleges that DHR unnecessarily prescribed hypertension drug Cardene I.V., resulting in the submission of false reimbursement claims to government healthcare programs. According to the SAC, DHR made patients wait for hours in its

---

[3] A Diagnosis-Related Group, or DRG, is a component of the reimbursement claims submitted by participating hospitals under Medicare.

facility until their hypertension symptoms became severe enough to justify prescribing the drug.

### b. The Unqualified Care Theory

The relators allege that in numerous DHR facilities, unqualified employees performed procedures without supervision and that DHR then submitted reimbursement claims as if licensed physicians had performed the procedures. Examples include unlicensed attendants implanting devices in, and removing them from, patients in the Cath Lab, as well as the Women's Hospital billing the government for deliveries performed by nurses as if performed by doctors. The SAC alleges that in August 2009, Mendez witnessed Dr. Yarra delegating angiogram procedures to unqualified technicians in the Cath lab, an incident she allegedly reported to Sue Bajus. Again, no corrective action was taken at that time. Additionally, during an unspecified period an Ear, Nose and Throat (ENT) specialist named Dr. Honrubia allegedly delegated procedures to his unqualified assistants and billed as if he had performed them.

### c. The Admissions Status Theory

The relators also allege that, in violation of Medicare and Texas Medicaid regulations: DHR's admitting nurses, rather than doctors, determined patients' initial admission status; non-physician employees downgraded patients' status following billing and discharge without physician input; DHR did not discuss status changes with patients before they were downgraded to outpatient status; and DHR would bill federal programs for the higher inpatient reimbursement rate despite having downgraded the patient's status

(together, the "Admissions Status" theory). These practices allegedly occurred in the Cath Lab, the Women's Hospital, and the pediatric units.

Relator Rushing cites several examples of employees improperly changing patients' admission status. First, she alleges that while working in the Cath Lab from February to April 2009, she was told to automatically assign inpatient status to patients who received a certain procedure. Rushing was allegedly reassigned to a different unit after she objected to the practice. Additionally, in October 2009, Karen McAlister, Rushing's supervisor, told her to continue changing patients' admission statuses without consulting DHR physicians, despite Rushing's objections that such conduct violated applicable Medicare and Medicaid laws. Around October 2010, Rushing informed another supervisor, Lulu Rizalde, that a social worker named Esmer Rawlings was changing the admissions status of patients without consulting physicians. Later, around May 25, 2011, relator Mendez allegedly reported to McAlister that a Medicare patient was improperly assigned inpatient status, and it is alleged that DHR subsequently submitted a Medicare reimbursement claim for that patient.

    d.    **The Illegal Remuneration Theory**

The relators additionally allege that DHR knowingly paid kickbacks or other unlawful consideration to physician-investors, in violation of the FCA[4] and TMFPA (the

---

[4] The relators filed the SAC before the Court dismissed with prejudice their federal kickback-based claims against the DHR Defendants. *See* Dkt. No. 156. The Court also previously dismissed with prejudice the relators' claims against defendants Lone Star National Bank, Lone Star National Bancshares-Texas Inc. (together, the "Bank"), and Alonzo Cantu. *See* Dkt. No. 147. Although the SAC repleads the same claims against Cantu, the Bank, and the DHR Defendants, the Court's prior rulings dismissing these claims will remain in place. *See* discussion *infra* Part V(a)(iii).

"Illegal Remuneration" theory). Specifically, beginning in 2010, in order to finance physicians' investment in DHR, the DHR Defendants allegedly provided below-market loans to physicians "indirectly" through the Bank. Unspecified DHR physicians also paid below-market rent on medical offices leased from DHR and received below-market loans from the Bank to build medical offices and residential homes. Additionally, DHR allegedly entertained the physicians using the Bank's funds and also exclusively referred patients to certain physicians or vendors. The SAC cites fifteen loans allegedly made by DHR to named DHR physicians between 2010 and 2012 and further alleges that over $45 million in loans were approved through September 2018.

      e.      **Retaliation Allegations**

Relator Rushing alleges that DHR harassed and ultimately terminated her for statutorily protected activity related to DHR's medical practices. In or about April 2009, Rushing was allegedly transferred to a different team after informing her supervisor that automatically assigning inpatient status to patients who received a certain procedure violated Medicare rules and regulations. In January 2011, she again relayed complaints about this and other practices to DHR's Compliance Department. Rushing also reported what she believed to be DHR's illegal practices to the Texas Office of Inspector General in March 2011. In April 2011, she was again moved to a different assignment within DHR. Around this time, she allegedly told her supervisors that she had contacted the Texas Department of Health and Human Services about the hospital's illegal billing practices. On May 25, 2011, Rushing was terminated.

### f. The Pending Motion to Dismiss

The relators originally filed this lawsuit suit under seal on July 12, 2011. The Court ordered the original complaint unsealed on December 17, 2020 (Dkt. No. 77), and the relators filed their First Amended Complaint ("FAC") on March 8, 2021. (Dkt. No. 82).[5] The Court previously granted in part and denied in part the DHR Defendant's motion to dismiss the FAC, giving the relators leave to amend. (Dkt. No. 145). The relators timely filed the SAC.

In the SAC, the relators allege that the DHR Defendants violated the FCA by: knowingly presenting, or causing the presentment of, false claims for payment to the United States (Count I); and knowingly making, using, or causing to be made or used false records or statements, either to get false claims paid or approved by the United States, or that were material to false claims (Count II). In Count III, relator Rushing alleges that DHR violated the FCA's anti-retaliation provision as to her. In Count IV, the relators allege that the DHR Defendants also violated the TMFPA by knowingly causing submission of false claims to the Texas Medicaid Program and by violating the Texas Anti-Kickback Statute. Pursuant to Rule 12(b)(6), the DHR Defendants have filed a motion to dismiss all four counts for failure to state a claim.

---

[5] On October 1, 2018, the United States declined to intervene in this matter (Dkt. No. 67). On March 28, 2019, the United States informed the Court that it had completed its investigation into the relator's allegations (Dkt. No. 74). Texas elected to not intervene on May 11, 2021 (Dkt. No. 107).

## III.   CONTENTIONS OF THE PARTIES[6]

The DHR Defendants contend that, as a matter of law, they are not liable under the FCA for the conduct of non-DHR employees, including contract physicians. Furthermore, as to all their theories, the relators cannot satisfy the heightened pleading standard applicable to FCA claims under Rule 9(b). Likewise, to the extent the relators assert the same theories under the TMFPA, their state law claim should be dismissed because the TMFPA is substantively the same as the federal FCA. Additionally, the DHR Defendants assert that relator Rushing has failed to state a claim for retaliation under Rule 8(a).

The relators argue that they have pleaded sufficient facts to hold DHR directly liable under for FCA violations. Specifically, as to their FCA and TMFPA claims, they have provided examples of fraud committed by DHR and its agents during the relators' employment that are sufficient to satisfy Rule 9(b). As well, they argue that the TMFPA's requirements are not as demanding as the FCA in certain respects or, alternatively, that the relators' state law claims should survive for the same reasons as its FCA claims. The relators also assert that Rushing has stated a plausible retaliation claim. Finally, the relators request leave to amend their Complaint in the event the Court determines that dismissal is appropriate.

## IV.   STANDARD OF REVIEW

### a.   Federal Rule of Civil Procedure 12(b)(6)

---

[6] The parties' arguments concerning the present motion largely resemble their arguments concerning dismissal of the FAC. *See* Dkt. No. 145, at 8.

Federal Rule of Civil Procedure 12(b)(6) authorizes a defendant to move to dismiss for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). Under the demanding strictures of a Rule 12(b)(6) motion, "[t]he plaintiff's complaint is to be construed in a light most favorable to the plaintiff, and the allegations contained therein are to be taken as true." *Oppenheimer v. Prudential Sec., Inc.*, 94 F.3d 189, 194 (5th Cir. 1996) (citing *Mitchell v. McBryde*, 944 F.2d 229, 230 (5th Cir. 1991)). Dismissal is appropriate only if, the "[f]actual allegations [are not] enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 1965, 167 L. Ed.2d 929 (2007). Moreover, in light of Federal Rule of Civil Procedure 8(a)(2), "[s]pecific facts are not necessary; the [factual allegations] need only 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Erickson v. Pardus*, 551 U.S. 89, 93, 127 S. Ct. 2197, 2200, 167 L. Ed.2d 1081 (2007) (per curiam) (quoting *Twombly*, 550 U.S. at 555, 127 S. Ct. at 1964). Even so, "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555, 127 S. Ct. at 1964 - 65 (citing *Papasan v. Allain*, 478 U.S. 265, 286, 106 S. Ct. 2932, 92 L. Ed.2d 209 (1986)).

In *Ashcroft v. Iqbal*, the Supreme Court expounded upon the *Twombly* standard, reasoning that "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft*

*v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 1949, 173 L. Ed.2d 868 (2009) (quoting *Twombly*, 550 U.S. at 570, 127 S. Ct. at 1974). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678, 129 S. Ct. at 1949 (citing *Twombly*, 550 U.S. at 556, 127 S. Ct. at 1955). "But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Iqbal*, 556 U.S. at 679, 129 S. Ct. at 1950 (quoting Fed. R. Civ. P. 8(a)(2)).

    **b.**     **Federal Rule of Civil Procedure 9(b)**

A complaint filed under the FCA must meet the heightened pleading standards of Rule 9(b). *United States ex rel. Russell v. Epic Healthcare Mgmt. Group*, 193 F.3d 304, 308 (5th Cir. 1999). Rule 9(b) states that, "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). The particularity required for such pleading, however, varies from case to case. *See Benchmark Elec., Inc. v. J.M. Huber Corp.,* 343 F.3d 719, 724 (5th Cir. 2003), *modified on other grounds*, 355 F.3d 356 (5th Cir. 2003). "At a minimum, Rule 9(b) requires allegations of the particulars of time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." *Id.* at 724 (internal citations omitted). More precisely, Rule 9(b)'s particularity requirement compels that "the who, what, when, where, and how [] be laid

11 / 18

out." *Id*. "Claims alleging . . . fraud [and] fraudulent inducement . . . are subject to [Rule 9(b)'s] requirements." *Frith v. Guardian Life Ins. Co. of Am.*, 9 F.Supp.2d 734, 742 (S.D. Tex. 1998).

## V. ANALYSIS & DISCUSSION

### a. False Claims Act: Presentment of a False Claim (Count I) and False Record or Statement (Count II)

The DHR Defendants seek dismissal of Counts I and II for failure satisfy Rule 9(b)'s heightened pleading standard. To properly plead an FCA violation under Counts I (presentment of a false claim) and II (a false record or statement claim), the relators must allege: "(1) . . . a false statement or fraudulent course of conduct; (2) made or carried out with the requisite scienter; (3) that was material; and (4) that caused the government to pay out money or to forfeit moneys due (*i.e.*, that involved a claim)." *Gonzalez v. Fresenius Med. Care N. Am.*, 689 F.3d 470, 475 (5th Cir. 2012) (internal citations omitted).[7] "[C]laims for medically unnecessary treatment are actionable under the FCA." *U.S. ex rel. Riley v. St. Luke's Episcopal Hosp.*, 355 F.3d 370, 376 (5th Cir. 2004). Additionally, "an express false certification on a claim form submitted to the Government for payment is actionable under the FCA" and "[t]hat the services be medically necessary is a condition for payment under the regulations." *Id.*

Although Rule 9(b) requires a plaintiff to plead with particularity "the who, what, when, where, and how" of the fraudulent activity, the standard "is not a straitjacket[.]"

---

[7] Congress amended the FCA in 2009, during the period of misconduct alleged here (2009 to 2011). *See* Pub.L. No. 111–21, § 386, 123 Stat. 1617 (2009). Although the 2009 amendments modified the statute's "false record or statement" and conspiracy provisions, these amendments do not affect the Court's analysis.

*United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 189 (5th Cir. 2009). With respect to a presentment claim, "a relator's complaint, if it cannot allege the details of an actually submitted false claim, may nevertheless survive by alleging particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted." *Id.*

                *i.*      <u>The Medical Necessity and Unqualified Care Theories</u>

The Court is of the opinion that, with respect to the Medical Necessity and Unqualified Care theories, the relators have stated a claim against the DHR Defendants under Counts I and II. The DHR Defendants were allegedly required to certify that the services for which they sought reimbursement were both medically necessary and provided as described in their reimbursement claims. However, the SAC identifies specific examples of unnecessary procedures and unqualified care that took place between 2009 and 2011 in the Cath Lab and the Women's Hospital. In each instance, a DHR employee, such as a supervisor, in-house counsel, or a management-level employee, allegedly knew of the violation. The Court determines that, as to these facilities only, the SAC has pleaded "reliable indicia" supporting an inference that DHR submitted false Medicare claims for reimbursement, and that DHR employees made or used false statements or records that were material to such claims. *Grubbs*, 565 F.3d at 190. However, for largely the same reasons as the Court described in its previous memorandum opinion, the SAC's allegations concerning all other DHR facilities do not satisfy Rule 9(b)'s stringent requirements. *See* Dkt. No. 145, at 12.

Therefore, except as to the allegations concerning the Cath Lab and Women's Hospital, the Court determines that Counts I and II should be dismissed with prejudice, as to the Medical Necessity and Unqualified Care theories. The dismissal includes allegations concerning DHR's marketing and prescription of hypertension drug Cardene I.V.

### ii.    *The Admissions Status Theory*

Once again, the Court is of the opinion that, as to the Admissions Status theory, the motion to dismiss Counts I and II should be denied.[8] The SAC alleges numerous incidents in which the relators reported to their supervisors that either they or their colleagues were being told to assign a particular admissions status to patients without consulting DHR physicians. In each case, the supervisors allegedly took no corrective action; in fact, they often told Rushing and Mendez to continue the complained-of practices. Thus, as to this theory, the relators have also pled "reliable indicia" supporting an inference that DHR submitted false reimbursement claims or made or used false statements or records that were material to such claims. Therefore, the motion to dismiss Counts I and II as to the Admissions Status theory should be denied.

---

[8] The Court previously denied the DHR Defendant's motion to dismiss Counts I and II on this theory. Dkt. No. 145, at 14.

### iii.  The Illegal Remuneration Theory

In the SAC, the relators reallege Counts I and II under the Illegal Remuneration theory, involved knowing payment of unlawful consideration to physician-investors. The Court previously dismissed with prejudice the relators' FCA claims under this theory, based on the FCA's public disclosure bar. *See* Dkt. No. 156, at 3–4; Dkt. No. 147. As the relators offer no novel basis for the Court to revisit its prior ruling, the dismissal remains in effect.

### b.  **Retaliation under the False Claims Act (Count III)**

The Court again determines that Rushing has stated a claim for FCA retaliation.[9] The plaintiff's retaliation claim is subject to review under Rule 8(a). *United States ex rel. Boston Scientific Corp.*, 864 F. Supp. 2d 597, 602–603 (S.D. Tex. 2012). The elements of an FCA retaliation claim are: (1) an employee "engaged in protected activity"; (2) the defendant-employer "knew about the protected activity"; and (3) the defendant-employer "retaliated . . . because of [the] protected activity." *United States ex rel. King v. Solvay Pharms., Inc.*, 871 F.3d 318, 332 (5th Cir. 2017). The FCA defines "protected activity" as "lawful acts done by the employee . . . in furtherance of an action under this section or other efforts to stop [one] or more violations" of the FCA. 31 U.S.C. § 3730(h).

In sum, Rushing was terminated approximately two months after notifying DHR that she had reported what she believed to be FCA violations to Texas government agencies (and four months after reporting such violations to DHR's Compliance Department). It is,

---

[9] The Court previously denied the DHR Defendant's motion to dismiss Rushing's retaliation claim. Dkt. No. 145, at 16–17.

therefore, plausible that DHR Defendants retaliated against Rushing because of her protected activity. Because Rushing's allegations, taken as true, state a retaliation claim against the DHR Defendants, the DHR Defendants' motion to dismiss Count III of the SAC should be denied.

### c. Violations of the Texas Medicaid Fraud Prevention Act (TMFPA) (Count IV)

Relators allege that the DHR Defendants[10] have violated five provisions of the TMFPA: §§ 36.002(4), (5), (6), (7), and (13). Subsections 36.002 (4), (6), and (7) create liability for making or causing false statements or claims regarding provision of Medicaid-reimbursable services. The Court's analysis of the analogous FCA claims applies equally to the relators' claims under these provisions. *United States v. Dental Health Programs, Inc.*, No. 3:18-CV-00463-E, 2020 WL 3064712, at *7 (N.D. Tex. June 8, 2020). Accordingly, the relators' claim based on subsection 36.002(7) are dismissed with prejudice.[11] However, the claims brought under subsections 36.002(4) and (6) are dismissed in part, and only to the same extent as Counts I and II. *See* discussion *supra* Parts V(a)(i)–(iii).

The remaining TMFPA provisions prohibit payment, solicitation, or receipt of kickbacks in exchange for furnishing, ordering, or arranging Medicaid-reimbursable goods

---

[10] The SAC also named the Bank and Cantu as defendants. However, this Court previously dismissed the Bank and Cantu from this suit, without prejudice to the relators' bringing state law claims against them in state court. Thus, the Court considers the SAC's state law claims only against the DHR Defendants.

[11] The Court comprehends the SAC to allege a violation of subsection 36.002(7) based on DHR's marketing and prescription of hypertension drug Cardene I.V. The Court has determined that these allegations do not satisfy Rule 9(b) and must be dismissed.

or services, or for referring patients to another provider for the furnishing or arranging of such services. TEX. HUM. RES. CODE § 32.039(13) (providing liability where a party "knowingly engages in conduct that . . . violat[es] . . . Section 32.039(b)"); *id.* §§ 32.039(b)(1-b)–(1-f). The claimed violations are based on the Illegal Remuneration theory, which the Court previously dismissed with prejudice as to the FCA, based on the federal statute's public disclosure bar. The Court determines *sua sponte* that the TMFPA's analogous public disclosure defense also bars the relators' state law claims. *Id.* § 36.113(b). Thus, the relators' kickback-based TMFPA claims are also dismissed with prejudice.

### d. Leave to Amend

The relators seek leave to amend their complaint to cure any pleading defects discerned by the Court. A district court "should freely give leave [to amend] when justice so requires." FED. R. CIV. P. 15(a)(2). However, a court may deny leave to amend for, among other things, repeated failure to cure a pleading's deficiencies. *Simmons v. Sabine River Auth. Louisiana*, 732 F.3d 469, 478 (5th Cir. 2013). The relators have now had two opportunities to amend their original complaint. Furthermore, as this matter has been pending since July 2011, the relators have had ample time to investigate the violations they allege. The Court is of the opinion, therefore, that granting leave to amend an additional time would not serve the ends of justice. Thus, the relator's request will be denied, and the Court will dismiss the relevant portions of the SAC with prejudice.

## VI.     CONCLUSION

Based on the foregoing analysis and discussion, the DHR Defendants' motion to dismiss is **GRANTED IN PART** and **DENIED IN PART**.

It is, therefore, ORDERED that:

1. Counts I and II of the Second Amended Complaint against the DHR Defendants, as premised on the Medical Necessity, Unqualified Care, and Illegal Remuneration theories, are DISMISSED WITH PREJUDICE as specified herein;

2. Count IV of the Second Amended Complaint against the DHR Defendants is DISMISSED WITH PREJUDICE as specified herein; and

**3.** The DHR Defendants' motion to dismiss is in all other respects DENIED.

IT IS SO **ORDERED**.

SIGNED on July 27, 2022, at Houston, Texas.

_____
Kenneth M. Hoyt
United States District Judge